[723 NYS2d 31]

In the Matter of RENNETTE B., a Person Alleged to be a Juvenile Delinquent, Respondent. PRESENTMENT AGENCY, Appellant.

First Department, April 10, 2001

## APPEARANCES OF COUNSEL

*Kathleen J. Cahill* of counsel (*Edward F.X. Hart* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for appellant.

*Kenneth Rabb* of counsel (*Arlene Libowitz* on the brief; *Monica Drinane, Legal Aid Society, Juvenile Rights Division,* attorney), for respondent.

## OPINION OF THE COURT

TOM, J.

The issue raised on this appeal is whether *Miranda* warnings should have been given to the 15-year-old respondent under the factual circumstances of this case, where police were called to respondent's apartment for assistance and found respondent's dead newborn infant.

On July 28, 1998 at shortly after 1:00 A.M., Lieutenant Stewart Liber and his partner went to 1762 Story Avenue, apartment 4E, in response to a radio report of a person in distress. Outside the building, they were joined by two other officers. In front of the building, he met Sheila Vereen, who stated that her cousin, respondent, had had a baby and the baby, who was up in the apartment, had died. Sheila apparently had made the 911 call to which the police were responding. She led them up to the apartment, where they met Mary Vereen, respondent's grandaunt. Liber was led into a bedroom where he saw respondent laying on one bed and the baby, wrapped in a towel, on the other bed. A garbage bag containing what appeared to be the afterbirth was near the baby's body. Liber felt for a pulse and, feeling none, made sure that an ambulance had been dispatched. EMS, in fact, arrived shortly afterward. Since there was a dead infant, he also was obliged to contact a detective supervisor, the Crime Scene Unit and the District Attorney's Office. With the exception of Detective John Weis, all others seem to have arrived much later in the morning. Aside from asking respondent how she felt, Liber did not ask her further questions and he had no further role in the subsequent investigation. Liber testified that respondent remained in the bedroom from the time of his arrival until she was later taken to the hospital. She was not restrained in the apartment, was

not under arrest, nor, to Liber's knowledge, was she even arrested the following day.

Detective Weis, assigned to Bronx Night Watch Homicide, responded to the apartment to investigate a report of "an infant that was dead on arrival." He arrived with another detective about 1:25 A.M., and spoke to Lieutenant Liber, who confirmed that there was a dead infant and that the mother was present. At this point there was a total of about five officers in the vicinity of the apartment. Weis met Mary Vereen in the vestibule area and asked her if there was somewhere they could go to talk. Weis recalled that Ms. Vereen said "Sure. There's a place we could talk," and she took him to what she called the "boys'" bedroom. In his direct examination, Weis also recalled that respondent, too, had met him in the vestibule area, though on cross he noted that his attention was primarily diverted to the officers and EMS personnel so that he was less than clear whether respondent was also in the vestibule. About 4 or 5 police officers were in the apartment at this time. Weis was in the bedroom with only Ms. Vereen and respondent. The door remained open. No other officers went in or out, nor could he even hear their conversation outside the bedroom.

Weis first looked at the baby for possible physical damage or other indications of physical abuse. Observing none, he turned the baby from side to side, again observing no injuries, and then examined the rear of the head and back, again finding no injuries. He then looked in the bag and observed what appeared to be afterbirth. Obviously, at this point, the preliminary conclusions were that respondent had recently given birth and that the baby was either born dead or died shortly thereafter.

Weis, who was in plainclothes, explained to respondent and Ms. Vereen that he was there to investigate "what happened," and that he "would like some kind of statement as to what happened." Parenthetically, we would suggest that this was not an unusual reaction nor even an unduly intrusive inquiry under such circumstances, where the detective, understandably, would have to prepare and submit a report. Notwithstanding that he was a homicide detective, responding because the call came in on his watch, the record does not evince that the detective believed himself to be investigating a homicide at this time.

Weis asked respondent if she wanted to write down what had happened, and she responded that he should write it. Weis had no difficulty communicating with either respondent or with

Ms. Vereen. At no point during the conversation did either respondent or her aunt indicate that they did not want to speak. Weis then asked respondent to tell him in her own words what happened to the infant. Rather than engaging in a question-and-answer format, Weis let her provide a narrative, and she gave a statement in the manner of a running story. On one occasion Weis had to ask her to slow down and clarify what she said. Aside from that time, he did not interject questions. Concededly, he did not provide *Miranda* warnings. After the statement was finished, Weis read his approximately four pages of notes back to respondent and her aunt and asked them to indicate if he had recorded anything incorrectly. Both concurred in the accuracy of the statement, and both signed it.

In relevant part, respondent stated:

> "At about 10 P.M. on 7/27/98, I was talking [*sic*] a shower, When [*sic*] I felt pain in my bellie [*sic*], and then the baby's head came out of my Vigina [*sic*] and then his feet and [*sic*] came out and the baby fell into the tub. Then I stood their [*sic*] for about fifteen minutes looking at the baby as it was laying in the tub and the blood was going down the drain. Then I picked the Baby and put him in a towle [*sic*]. And I got dressed and cleaned upthe [*sic*] bathroom and put the bloddy [*sic*] towels in the washing machine to clean them. Then I took my baby and put him on the bed wrapped in a towel, with his head sticking out. Then I went into the kitchen and ate Dinner, I did'nt [*sic*] tell my Aunt what happened because I was afraid to tell her. After I ate my dinner I went into the bedroom to watch a tape of Home Alone. Then my cusin [*sic*] Sheila Vereen came into the room and asked me if it was a baby and I said no, it was a dollbaby. And then my aunt Mary Vereen came in opened the towle [*sic*] and saw the baby and called 911."

After the interview, Weis thanked respondent and her aunt and asked them if they had any questions for him. Neither one did. The entire transaction, from the time he had entered the room, including the examination of the baby, the interview and writing, and reading back of the statement, took approximately 25 minutes. At no time was respondent restrained. Thereafter, no "attentions were * * * kept on her. She was free to go as she chose." When he left, no cause of death had been determined, and neither he nor his supervisors had ruled the death

a homicide, although it was classified as an "investigative DOA" requiring further investigation to reach a conclusion as to what happened to the infant. After Weis was relieved of duty at about 8:00 A.M., he conducted no further investigation of the matter. When he left the apartment, two members of the Crime Scene Unit, in addition to about five officers were present, as were an Assistant District Attorney and some EMS personnel.

Liber testified that subsequently respondent was removed to a hospital at about 3:45 A.M. for a psychiatric evaluation, and that during the removal she was handcuffed for safety reasons as a matter of policy. This factor occurred well after the inquiry and was based on circumstances unrelated to the inquiry itself, and thus has no bearing on our analysis.

On or about December 3, 1998, the presentment agency filed a juvenile delinquency petition in Bronx Family Court charging respondent with committing acts which, were she an adult, would constitute the crimes of assault in the first degree, manslaughter in the second degree, and criminally negligent homicide based upon conduct alleged to have caused the death of her newborn infant on July 28, 1998.

At the *Huntley* hearing, the Family Court found the apartment to have been police-dominated and that the questioning was coercive. The court suppressed the mother's statement on *Miranda* grounds. The petition subsequently was dismissed on the ground that the presentment agency failed to establish the allegations. The presentment agency appealed both the order suppressing respondent's statement and the order dismissing the petition. We now reverse.

We find that there is no reasonable, objective, reading of the record to support Family Court's conclusion that the respondent mother was subjected to custodial interrogation, the necessary predicate for invoking *Miranda*.

It is well established that the communication between a police officer and a citizen that triggers the constitutional safeguards imposed by *Miranda* must be made in the context of an interrogation and must be within a custodial setting (*People v Huffman*, 41 NY2d 29, 31). If either factor is absent, then the *Miranda* rule is inapplicable. Both turn in part on the coerciveness, or lack thereof, of the setting in which an investigation is conducted. For the constitutional analysis in the present case, three factors, along with lesser factors, are especially salient: respondent's own family sought help, to which police and others responded; although the situation

might have been ambiguous, there was no apparent homicide nor signs of foul play; and the nature of the inquiry—"what happened"—was kept generic. Although Family Court concluded that this question directly implicated the crime, that conclusion is untenable. First, as noted, there was no apparent crime. Moreover, the question "what happened" did not specifically correlate with any particular conduct and this did not directly implicate criminal conduct as the Family Court found. The police were summoned to the apartment and therefore were required to make a report. The detective's routine and generic inquiry—"what happened"—simply does not lend itself to being characterized as coercive interrogation.

We must first determine whether respondent was interrogated within the meaning of *Miranda* and related case law. With regard to how the communication is conveyed, the standard is whether a reasonable person in similar circumstances would conclude that the nature and extent of police comments were designed to elicit an incriminating statement, which would be interrogatory within the meaning of the constitutional case law that has developed on the point (*Rhode Island v Innis*, 446 US 291; *People v Rodney P.*, 21 NY2d 1; *People v Blunt*, 273 AD2d 146, *lv denied* 95 NY2d 850) or whether it constitutes "routine police investigation * * * at a person's home * * * the kind of questioning which has uniformly been held not to require the *Miranda* warnings" (*People v Rodney P.*, *supra*, at 10-11). A police officer responding to an incident may conduct such routine investigative questioning without the need to provide the warnings (*People v Bennett*, 70 NY2d 891) even if the person is briefly detained, and even frisked in his or her apartment, for investigative purposes (*People v Morales*, 65 NY2d 997).

In case law deriving from *Huffman* (*supra*), we have distinguished questions by responding police intended to clarify a situation from those intended to specifically elicit a suspect's admission of criminality (*People v Vaughan*, 273 AD2d 99, *lv denied* 95 NY2d 939; *People v Harris*, 272 AD2d 225, *lv denied* 95 NY2d 935; *People v Williams*, 271 AD2d 335, *lv denied* 95 NY2d 859; *People v Weston*, 234 AD2d 90, *lv denied* 89 NY2d 989). Courts have recognized that ambiguous crime scenes sometimes require eliciting explanations from more than one person prior to police action being taken (*People v Esposito*, 138 AD2d 733), so that preliminary inquiries in this context will often pass constitutional muster. Briefly allowing a person to explain a situation that may or may not constitute a crime

does not convert questions into interrogation: the attempt, again, is to clarify a situation during an initial investigation rather than to elicit an inculpatory statement from a suspect (*People v Fong*, 233 AD2d 115, *lv denied* 89 NY2d 942 [defendant stopped by private security in possession of car asked by police for documentation]; *accord People v Harris, supra*). In the instant case, Detective Weis found no injuries to the apparently newborn infant. There was a dead baby, but no apparent homicide, and hence no suspect. Weis merely asked respondent to explain and clarify the situation as part of his initial investigation. This was not an attempt to obtain an inculpatory statement from respondent. Thus, no *Miranda* warnings were required.

We also draw no conclusions from the fact that a crime scene team arrived thereafter to photograph the apartment. Although, concededly, the record is less than satisfactory on the point, this seems more of a tripwire response to a report of a deceased infant. Police responded to a 911 call from a member of respondent's own family, and police attention was plausibly, and even necessarily, directed to the baby's mother. We draw no conclusions from the detective's characterization of the death as needing further investigation—he was not a physician and had no sound basis to effectively close the investigation. The inquiry was kept generic, even if, again, it was repeated with a follow-up generic inquiry designed only to clarify. The nature of the question or questions here falls comfortably within the constitutional parameters established by case law.

Questioning, of course, may cross the border between routine investigative questions and questioning that targets a citizen as a suspect and is designed to elicit admissions when the interviewee is subject to significant restraint on his or her ability to decline responding to the officer's communications. Courts have long recognized that any person being questioned by an officer may likely feel some degree of restraint, but that is not the standard. Rather, the significance of the restraint traditionally has turned on the extent to which the interviewee's "will to resist" is overcome in a manner that "compel[s] him to speak where he would not otherwise do so freely" (*Rodney P., id.*, at 5, quoting *Hoffa v United States*, 385 US 293, 304). However, there is no persuasive evidence of any such coerciveness here: it bears repeating again that respondent's cousin had summoned police, she and the aunt invited their entry, the aunt sat with respondent throughout the brief question or ques-

tions, and that Weis testified, with no evidence to the contrary, that respondent was free to leave. Especially insofar as the condition of the baby's body and the attendant circumstances evinced no immediate basis to suspect a homicide, there is no evidence in the record that Weis "compel[led her] to speak where [she] would not otherwise do so freely." (*Id.*) Moreover, as already noted, respondent herself chose to be in the bedroom, and on the bed, so that the presence of the baby's body in that location has no significance from the standpoint of the possibility of the police using that as a subtle means of overcoming respondent's "will to resist" (*Rodney P., supra*). As such, there is no sound basis to find that interrogation, within the meaning of *Miranda* jurisprudence, occurred.

Respondent's supporting case law is inapposite to these circumstances. In *Matter of Chad L.* (131 AD2d 760), a ten-year-old boy raped a four-year-old girl, then killed her by striking her. He was known to have been the last person with her. He was then questioned, by two detectives, in the room with her body, with the door essentially closed. The decision does not indicate that an adult family member was present. Understandably, the court found interrogation to have occurred. In *Matter of Robert H.* (194 AD2d 790, *lv denied* 82 NY2d 658), one 15-year-old respondent approached an officer to report that a friend had been accidentally shot in a nearby house, and that he helped drag the body to the woods. He then directed the officer to the body. Another 15-year-old respondent purportedly was pushed against a car during questioning by a responding officer. As many as eight officers were present during the questioning, and neither child was told that they could contact their parents. The mitigating elements present in our case, which lead us to find the absence of interrogation of a teenager, were absent in *Robert H.*

These cases lead naturally to the related issue of custody, also a factor arising from a coercive environment so that there is a degree of overlap in the analysis. The standard to be employed is whether a reasonable 15-year-old would have perceived herself as not being free to leave (*cf., Matter of Robert H.; see, generally, People v Yukl*, 25 NY2d 585, *cert denied* 400 US 851). The question of custody is more easily resolved when there has been an arrest or a clear detention, factors not extant here. Here, when all relevant facts and circumstances drawn from record evidence are considered, we conclude that there was no custodial setting prior to or during the inquiry. Respondent relies on the size of the police presence. However,

with the exception of Weis, other law enforcement personnel were out of the room, out of sight and possibly even out of hearing. Many of those present at various times appear to have been technical personnel—their presence had no ramifications on the issue of custody—or officers who responded to a 911 call from respondent's own family. Again, respondent chose the bedroom, contrary to *Chad L.*, so she can hardly complain that she was cloistered therein. It bears repeating that, unlike *Robert H.* and *Chad L.*, there was no apparent crime, and hence, again, no suspect necessitating custody, another factor militating against the putative coerciveness of the environment. Neither respondent nor her aunt reacted in any manner that suggested that they wanted to leave, or wanted police to leave, and Weis's testimony that she was free to go remains unrebutted.

Family Court found significant inconsistencies within Weis's testimony and between his and Mary Vereen's testimony. We read the record differently. Rather, Weis conceded when his memory was unclear, and credibly explained why. Ms. Vereen significantly corroborated material details of Weis's testimony. Where there are minor inconsistencies, they do not detract from the overall credibility of his testimony.

Mary Vereen, whose testimony was relatively short, recalled that she first met the detective in "the foyer," and that respondent was laying on a bed near the infant when Weis entered the room. She could not recall Weis's name, but recalled only that the interviewing detective was short, heavy-set and had white hair. He asked respondent what happened. Respondent then responded. Although Weis would thus prompt respondent when she paused, he did not ask any other questions nor did he interrupt her narrative. Ms. Vereen recalled that respondent would speak for a little while, and Weis would ask what happened next. Although she conceded that she could not remember, she thought that Weis might have stood rather than sat on the bed. No one ever indicated that respondent was under arrest prior to the questioning.

Family Court, evaluating whether the interview occurred in the context of a coercive atmosphere, described Weis, interestingly in view of Ms. Vereen's testimony, as being a large man— not the description given by Ms. Vereen. The court found that most of the testimony of the three witnesses was "undisputed in all major respects," and where there were discrepancies, that Liber's and Ms. Vereen's testimony was "more credible than that of Detective Weis whose recollection of details was

neither consistent nor convincing." The court noted the discrepancy about whether respondent had been in the bedroom, not having moved from her bed, or had been elsewhere in the apartment when Weis arrived. Weis, though, conceded his own lack of recall on the point and provided an explanation. Plausibly, Weis might have confused respondent's cousin Sheila with her, or perhaps he had not yet had a basis to focus sufficiently on respondent. However, his testimony does not evince any intent to fabricate, the implication of the court's findings notwithstanding. The court noted that Weis recalled sitting on the bed during the statement, though Ms. Vereen recalled that he stood. However, Ms. Vereen conceded being less than clear on the point in her own memory. Although Weis did not recall hearing others move about outside the bedroom, Ms. Vereen did. Although the factor of commotion outside the door may have some relevance in evaluating the scale of the police presence, this is not a basis to discredit the officer under these circumstances.

On the basis of these purported minor inconsistencies, the court discredited Weis's testimony. We reject this finding on this record. Next, the court found the apartment at the time to have been "clearly a police dominated environment." The court noted the presence of "approximately ten uniformed officers wearing weapons," described later in the decision as ten or fifteen individuals outside respondent's door. However, one may note that the two detectives were in plainclothes, and the record does not seem to rebut Weis's testimony as to the number of officers present. Rather, the picture seems unclear. The court's description continued: "indeed * * * it appears that it would have actually been difficult for the respondent to get through the crowd of officers and detectives standing outside her bedroom door in the narrow hallway between her bedroom and the front door"—which does not gainsay that there were no other officers *in the bedroom* at any relevant time period. If the court's finding is correct that respondent never left the bedroom, one must wonder, in evaluating respondent's own impressions of the "police dominated environment," how she knew about the number of police officers milling around outside. In any event, the court found that "[a]lthough the situation in the apartment was not designed to subjugate, it clearly would have had an intimidating effect on a fifteen year old even though she was in her own home and in the presence of her aunt." And the fact that respondent was in her own home, and with her own aunt, certainly must be taken

into account for these purposes. The court found that "large uniformed police officers were coming in and out of the room"—again a descriptive scenario that seems at variance with the record—"examining the body of her baby which lay just a few feet away from her." But, since that seems to be where respondent, herself, chose to lay down, it is difficult to fault responding police on that basis. After all, the court credited Ms. Vereen's testimony that respondent was in the bedroom at all relevant times. The court also described Weis as standing above her, but there is no dispositive evidence rebutting Weis's memory that he had sat down.

Nor does the descriptive point being made by the court equate with coerciveness under these circumstances. Whether a plainclothes officer described by Mary Vereen as short and white haired who simply asked respondent what happened, in the presence of the aunt, without other officers being present, stood or sat, is not in the final analysis material to the issue of the coerciveness of his inquiry. Even in remembering that Weis stood, Ms. Vereen did not indicate that he blocked the open door or by other body language communicated coerciveness.

Accordingly, the order of the Family Court, Bronx County (Cira Martinez, J.), entered on or about June 16, 1999, which, after a hearing, granted respondent's motion to suppress a statement and order, same court (Clark Richardson, J.), entered on or about June 22, 1999, which dismissed the petition, should be reversed, on the law and the facts, without costs, the motion denied, the petition reinstated and the matter remanded for further proceedings.

NARDELLI, J. P., MAZZARELLI, ELLERIN and RUBIN, JJ., concur.

Order, Family Court, Bronx County, entered on or about June 16, 1999, and order, same court, entered on or about June 22, 1999, reversed, on the law and the facts, without costs, the motion by respondent to suppress a statement denied, the petition reinstated and the matter remanded for further proceedings.