(No. 95350.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MARY BRAGGS, Appellee.

*Opinion filed December 18, 2003.—Modified on denial of rehearing April 15, 2004.*

James E. Ryan and Lisa Madigan, Attorneys General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Lisa Anne Hoffman and Linda D. Woloshin, Assistant Attorneys General, of Chicago, and Renee G. Goldfarb, Annette Collins, John E. Nowak and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

Edwin A. Burnette, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellee.

JUSTICE RARICK delivered the opinion of the court:

Defendant, Mary Braggs, was charged in the circuit court of Cook County with two counts of first degree murder for the deaths of Connie Hall and Donald Rudolph. After refusing to conduct a hearing on defendant's pending motion to suppress statements, the circuit court determined that defendant was unfit to stand trial due to the severity of her mental retardation. The court thereafter conducted a discharge hearing, found the State's evidence sufficient to establish defendant's guilt beyond a reasonable doubt, and remanded defendant to the Department of Mental Health and Developmental Disabilities for a period of five years. Defendant appealed.

The appellate court reversed and remanded. *People v. Braggs*, 302 Ill. App. 3d 602 (1998). Holding that the circuit court had erred when it refused to conduct a suppression hearing, the appellate court remanded the cause for a hearing on defendant's motion to suppress. The appellate court also concluded that the evidence was sufficient to establish guilt beyond a reasonable doubt for purposes of the discharge hearing.

On remand, the circuit court conducted a hearing on defendant's motion to suppress, hearing testimony from the investigating detective, a psychiatrist, a clinical psychologist, and an assistant State's Attorney who had interviewed defendant after she was formally arrested. The court ultimately ruled defendant was not competent to waive her *Miranda* rights, and consequently granted defendant's motion with respect to statements made to the assistant State's Attorney after defendant's arrest. However, the court did not suppress an inculpatory statement defendant allegedly made to detectives shortly before she was formally arrested, concluding that defendant was not then in custody, there was no evidence of police coercion or misconduct, and the statement was, therefore, admissible. The circuit court determined that a new discharge hearing was not necessary and reinstated the original order committing defendant to the Department of Mental Health. Defendant again appealed.

The appellate court reversed and remanded, stating:

"[W]hen the trial court ruled that Braggs' statements to the police were admissible because she was not in custody and *Miranda* was inapplicable, it was in error. Likewise, the court's ruling that, in the absence of police coercion or the defendant being in custody, the fact that Braggs was mentally handicapped was to be considered only as to the weight to be given her statements and not as to whether those statements were inadmissible, was in error. The court should have considered whether Braggs' statement to the detectives was voluntary in a state-law sense based upon the totality of the circumstances. [Citation.] One of the factors that the court should have considered was whether Braggs' mental retardation deprived her of 'the capacity to understand the meaning and effect of the confession.' [Citation.] This is particularly important in the present case, where the trial court found the defendant was incapable of waiving her rights under *Miranda* due to her diminished mental capacity." 335 Ill. App. 3d 52, 65.

The appellate court remanded the cause for a new hearing on defendant's motion to suppress, directing the

circuit court to conduct a new discharge hearing thereafter. 335 Ill. App. 3d at 69. The appellate court observed, "much of the evidence presented at the motion to suppress hearing was unavailable to the court which conducted the 1996 discharge hearing." 335 Ill. App. 3d at 69.

We granted the State's petition for leave to appeal (177 Ill. 2d R. 315), and we now affirm, with modification, the judgment of the appellate court. We begin with a recitation of the evidence adduced at the suppression hearing.

Chicago police detective Edward Winstead testified that he investigated the deaths of Donald Rudolph and Connie Hall. The victims' bodies were both found in a first-floor apartment located on South Prairie Avenue in Chicago on April 28, 1993. Although officers initially thought that Rudolph had been beaten to death, it was later determined that Rudolph died as a result of strangulation. Hall died as a result of multiple stab wounds. During the course of the investigation, Winstead began looking for defendant.

On May 7, 1993, Survilla Cameron contacted Winstead and informed him that defendant lived with her. Cameron represented herself to be defendant's sister and guardian; however, Winstead admitted he never saw any documentation to substantiate Cameron's claim. After Cameron indicated that Winstead could speak with defendant, Winstead transported defendant and Cameron to Area One and questioned her. Prior to questioning, Cameron informed Winstead that defendant was "mentally incompetent." Winstead admitted one could "clearly see that she was mentally deficient." Cameron agreed to help Winstead in his interrogation of defendant, but cautioned him that defendant was "slow." Winstead did not advise defendant of her *Miranda* rights. The interrogation took place in an interview room with another detective present.

Winstead testified he had difficulty communicating with defendant in that "sometimes she wouldn't answer questions," and other times she was "very slow in answering." In Winstead's own words: "She would be very slow in answering. And her sister would then kind of repeat the question or if Mary Braggs seemed to be paying attention to me she would then answer to her sister." If defendant responded, she would generally direct her answers to Cameron, and Cameron would then "tell [Winstead] what [defendant] was saying." However, Winstead testified he could hear defendant as she spoke. During the interrogation, Cameron acted as an intermediary for Winstead. Defendant's answers were responsive to Winstead's questions in the sense that defendant would respond to questions repeated by Cameron and first posed by Winstead.

Winstead summarized the substance of defendant's statements from the hour-long interrogation. According to Winstead, defendant told him that she was in the apartment on South Prairie Avenue when two black males came to the door. Defendant overheard an argument and hid in the closet. When she came out, defendant saw Hall dead in the bedroom. Defendant said Hall had been stabbed and was wearing white. Defendant said Rudolph was in the front room. He had been hit in the head with a wrench and had been strangled to death. Winstead testified that defendant's description was "very accurate as to how the victims died and where they were found." Following the interrogation, Winstead took defendant and Cameron home.

On the morning of May 9, Winstead again questioned defendant, this time at Cameron's apartment. As in all of the interviews, Cameron was present. Detective James Redmond was also present. Winstead said defendant was still very slow in answering questions, or she might not answer at all, but during this second interrogation, she

at least spoke directly to him most of the time. Winstead testified he went to question defendant, a mere two days after the first interrogation, "to see if [he] could get a little bit more information, if she recalled more about the two black males who came to the door and the argument." Winstead testified that defendant told him one of the men was named Ron and he was a friend of Cleo. Defendant described the other man as a tall black male. Winstead testified that the investigation revealed Ron Thomas was an acquaintance of Cleo and the victims, and when Winstead located him he was with a tall black male named Mike.

Later that same afternoon, Winstead picked up defendant and Cameron and took them to Area One. Winstead spoke to defendant in an interview room. He indicated, as previously, it took defendant a long time to answer questions. "Often times [sic] she would put her head down and say 'I don't know.' " Winstead showed defendant photographs of Ron Thomas and Mike. Defendant quickly identified the photograph of Mike as being the tall black male. Winstead said she was at first uncertain of the identity of Ron Thomas, then she positively identified him. Winstead testified that when he informed defendant the men were at the police station, defendant changed her story. Defendant then said that these were not the two men who came to the apartment and that it was two different men. Defendant reiterated that two men came to the door and she hid in the closet.

Winstead testified that on that same afternoon he took defendant and Cameron to the scene of the murders. Defendant pointed out where the two bodies were found. Winstead testified that her account was consistent with where the bodies were found by the police. Defendant then showed Winstead the closet where she hid. Winstead testified he examined the closet and defendant "couldn't have possibly fit in there." Winstead then took

defendant and Cameron home, having questioned defendant at three different locations over the course of the day.

On May 12, Winstead transported defendant and Cameron to the polygraph unit of the Chicago police department. Although defendant was cooperative, the polygraph examination was inconclusive because defendant did not register enough emotion. Again, defendant was returned to Cameron's apartment. Cameron and defendant subsequently changed residences.

On June 25, 1993, Winstead picked up defendant and Cameron from their new apartment and again took them to Area One for questioning. Prior to the questioning, Winstead informed Cameron that the police were looking at defendant as a potential suspect. Despite the State's representation otherwise, the record is silent as to whether that information was communicated to defendant. Winstead, another detective, defendant, and Cameron were present in the interview room. Winstead advised defendant of her *Miranda* warnings from a standard form without additional explanation. Defendant made no verbal response; she merely nodded her head in an affirmative manner. Although Winstead could not remember her exact words, he recalled that Cameron said something to the effect of: "he's telling you that you don't have to talk to me and that you're not going to be in trouble or something." Defendant nodded her head in agreement and "seemed to understand what her sister was saying." Defendant never verbally indicated that she understood, and she did not sign a waiver form. Indeed, it is unclear to what extent defendant ever responded to, or communicated with Winstead. He acknowledged that Cameron "initially" acted as an "interpreter," and it is obvious from the foregoing testimony that she was still acting in that capacity on June 25, 1993, despite Winstead's suggestion to the contrary: "After a while, after I

talked to [defendant] somewhat, I could begin to understand or she'd answer me or she wouldn't." The record does not indicate whether Winstead's questions to defendant were suggestive or leading, or whether they called for a narrative response.

Although the transcript of the suppression hearing does not reveal the substance of statements defendant made during the June 25 interview, the testimony of another detective from the discharge hearing indicated that defendant said she and Connie Hall were in an apartment together on April 28, 1993, when Donald Rudolph returned. Rudolph was drunk and struck both defendant and Hall. Defendant then knocked Rudolph down and he struck his head. Hall became upset, accusing defendant of killing Rudolph, and defendant then stabbed Hall a number of times in her upper body. Following the hour-long interview, defendant was placed under arrest. An assistant State's Attorney arrived at the police station and again advised defendant of her *Miranda* warnings.

Dr. Philip Pan, a psychiatrist, testified for the defense. On May 16, 1996, Pan diagnosed the defendant as having moderate mental retardation and determined defendant was unfit to stand trial. He noted that four other psychiatrists had reached the same conclusion. In 1996, Pan concluded it was not likely that defendant could be restored to fitness anytime in the near future. On August 31, 1999, Pan again evaluated defendant. Dr. Pan testified that defendant was unfit for trial and would not become fit in the future. Pan also rendered his opinion that defendant was incapable of understanding *Miranda* warnings.

By way of explanation, Dr. Pan testified that defendant could give simple answers to questions she understood, but she was not capable of abstract thinking. Although she knew she was born in 1941, defendant told

Dr. Pan, in the course of his 1999 interview, that she was 29 years old. Her thinking was "idiosyncratic," meaning that she was often "not on the same page" as the person questioning her. She would frequently answer questions in a completely irrelevant manner. When asked the meaning of her right to remain silent, she responded that she already had an attorney. When Pan asked her what it meant that anything she said could be used against her in a court of law, she responded, "he know I didn't do those two crimes. That is something I didn't do."

Dr. Linda Wertzel, a clinical psychologist, also testified for the defense. Wertzel had examined defendant in 1994 and testified to her findings. Wertzel concluded that defendant was mentally retarded with an IQ of 54. Wertzel described her observations of defendant at that time:

> "[S]he was flat and passive, kind of emotionally blunted, no affect. She was overweight. She was—her clothing was dirty. Her hygiene was very poor. She was picking at her skin and nails and nose and ears. She was nonspontaneous in her speech."

Defendant could provide only "simple answers to direct questions and really did not provide a narrative of information." She stated her age to be 29. Testing revealed that defendant functioned, mathematically, at a kindergarten level. Defendant was unsure if she had ever gone to school. She could not read or write.

Wertzel administered a test designed to measure a person's ability to express thoughts accurately and coherently and to comprehend what other people say. She determined that defendant could only express herself at a "very simple childish level" and she could not comprehend more than a one-step command. Wertzel said the test involved asking the subject to touch colored shapes in sequence. Wertzel first asked defendant to touch a red square (one-step command), then asked her to touch a red square and a yellow circle in sequence (two-step command). Defendant could not get beyond the one-step com-

mand. Defendant was inconsistent in her ability to identify shapes correctly. She displayed impairment on both motor speed and motor dexterity tests. She could not accurately draw and number the face of a clock.

When asked the meaning of various *Miranda* warnings, defendant either said she did not know or she offered an irrelevant or inappropriate response. Eventually, defendant became frustrated and the interview was terminated. As a result of her 1994 examination of defendant, Wertzel concluded that defendant was illiterate, mentally retarded, "only minimally able to care for her basic daily needs, her comprehension of her current circumstances was marginal, and she was unable to understand her *Miranda* rights."

Wertzel examined defendant again in October 1999 and concluded she remained unable to understand her *Miranda* warnings. Dr. Wertzel testified that defendant's behavior was "pretty similar" to her first encounter with defendant. Defendant "acted as though she had only been in jail for about a week." She identified Kennedy as president of the United States. Wertzel administered the Peabody Picture Vocabulary Test, in which the subject is shown a picture and is asked to name activities or pastimes represented therein. Defendant scored the age equivalent of a five-year-old. After her 1999 examination of defendant, Wertzel again concluded it was "highly unlikely" that defendant ever had the ability to comprehend or waive *Miranda* rights.

Wertzel described defendant as "sort of like a child, *** unsure of what is real and what is imagined, what is an actual memory, what is told to them." Moreover, she stated that defendant does not tolerate stress very well and is "suggestible." Wertzel described more than one instance where she was able to lead defendant in the questioning to get the information desired.

In rebuttal, the State called Assistant State's At-

torney Stan Gonsalves. Gonsalves testified he went to Area One on June 25, 1993, to interview defendant. Prior to meeting defendant, detectives told Gonsalves defendant was "a little slow." Gonsalves advised defendant of her *Miranda* warnings. Gonsalves said defendant was "just quiet at that point." Defendant did not respond verbally when she was asked if she understood her rights. Defendant nodded her head affirmatively after Gonsalves finished giving her the *Miranda* warnings. Cameron was in the room, but did not say anything. Gonsalves testified that defendant was responsive to his questions during the interrogation, but he conceded that communicating with defendant was "difficult" and "slow." The record does not indicate whether Gonsalves' questions to defendant were suggestive or leading, or whether they called for a narrative response.

After hearing testimony in this matter, the circuit court rendered its ruling. The judge's initial statements indicate that he believed the issue in this case was the same as that presented in *People v. Bernasco*, 138 Ill. 2d 349 (1990), cited by defendant. The court perceived the issue as "two fold": whether defendant's statements were obtained free of police coercion, misconduct, or overreaching; and whether "a valid *Miranda* waiver must be knowing and intelligent."

Citing *Colorado v. Connelly*, 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986), the circuit court stated that a confession is not rendered involuntary under the federal due process clause without "some police overreaching." In the circuit court's view, there was no evidence suggesting that the police had done anything to coerce the defendant to give a statement. The court ruled that defendant was not in custody until after she had confessed to Winstead; consequently, *Miranda* warnings were not required prior to that time, and any statements she made before that point were admissible. The circuit

court determined that Winstead had "gratuitously offered" defendant *Miranda* warnings on the morning of her arrest, even though the warnings were not required by the attendant circumstances. The court said there was "no dispute" that defendant was mentally handicapped, but ruled "that goes to the weight of those statements, not to whether those statements were admissible."

The court concluded that defendant *was* in custody following her statement to the Winstead and she did not knowingly and intelligently waive her *Miranda* rights. In so ruling, the court relied upon the uncontroverted testimony of Pan and Wertzel, and that of law enforcement personnel who observed defendant's actions and demeanor during periods of interrogation. The court specifically mentioned "the testimony of Winstead about how she acted and [Assistant] State's Attorney Gonsalves that she did not respond verbally [when] given her rights. She merely stood silent."

Based upon the uncontested testimony of the witnesses, the court suppressed the statement defendant made to Assistant State's Attorney Gonsalves following her arrest. The court, however, denied defendant's motion with respect to any statements made *before* defendant was in custody.

On appeal, the State posits a single issue: whether defendant's final "statement" or "confession" to Winstead—which, on the basis of the trial court's ruling, the State assumes was noncustodial—was "constitutionally voluntary because it was given without police coercion"—a second assumption based upon conclusions the trial court drew from undisputed facts. Defendant continues to argue, *inter alia,* that defendant was in custody when she gave the allegedly inculpatory statement to Detective Winstead and that she did not effectively waive her *Miranda* rights. The State disputes the former contention, but not the latter.

We begin our analysis by identifying the relevant standard of review and the burden of proof. A court of review will accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence; however, the court will review *de novo* the ultimate question posed by the legal challenge to a trial court's ruling on a motion to suppress. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001); *People v. Schoening*, 333 Ill. App. 3d 28, 31-32 (2002). Where a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving the confession was voluntary by a preponderance of the evidence. 725 ILCS 5/114—11(d) (West 2000); *In re G.O.*, 191 Ill. 2d 37, 49 (2000). The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. *People v. Reid*, 136 Ill. 2d 27, 54 (1990); *People v. Joya*, 319 Ill. App. 3d 370, 378 (2001).

In this case, the trial court determined that defendant was unable to effectively waive her *Miranda* rights, based upon the unrefuted testimony of the doctors who had examined her and law enforcement personnel who observed her actions and demeanor. Consequently, the trial court granted the defendant's motion to suppress as to statements allegedly made by defendant after she was formally arrested. The court denied defendant's motion with respect to her earlier statement to Winstead only because the court believed she was not "in custody" for purposes of *Miranda* at that time. Since defendant continues to argue that she *was* in custody when she was interrogated by Winstead at the police station on June 25, 1993, we first address the custodial issue.

The determination of whether a defendant is "in custody" for *Miranda* purposes involves "[t]wo discrete inquiries ***: first, what were the circumstances sur-

rounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 133 L. Ed. 2d 383, 394, 116 S. Ct. 457, 465 (1995); *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003). See also *Berkemer v. McCarty*, 468 U.S. 420, 442, 82 L. Ed. 2d 317, 336, 104 S. Ct. 3138, 3151 (1984) ("the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"). Thus, in determining whether a person is "in custody" for purposes of *Miranda*, a court should first ascertain and examine the circumstances surrounding the interrogation, and then ask if, given those circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. *People v. Patel*, 313 Ill. App. 3d 601, 604 (2000). With respect to the latter inquiry, the accepted test is what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes. *People v. Fair*, 159 Ill. 2d 51, 67 (1994), quoting *People v. Wipfler*, 68 Ill. 2d 158, 166 (1977).

When examining the circumstances of interrogation, the following factors have been found relevant in determining whether a statement was made in a custodial setting: the location, time, length, mood, and mode of the interrogation, the number of police officers present, the presence or absence of the family and friends of the accused, any indicia of formal arrest, and the age, intelligence, and mental makeup of the accused. See *People v. Lucas*, 132 Ill. 2d 399, 417 (1989); *People v. Fletcher*, 328 Ill. App. 3d 1062, 1073 (2002); *People v. Armstrong*, 318 Ill. App. 3d 607, 613 (2000); *Patel*, 313 Ill. App. 3d at 604-05; *People v. Rivera*, 304 Ill. App. 3d 124, 128 (1999); *People v. Savory*, 105 Ill. App. 3d 1023, 1028 (1982). Although it is generally irrelevant that the interrogating officer subjectively viewed the individual under question-

ing as a suspect, the officer's beliefs, if conveyed by word or deed to the individual being questioned, *are* relevant to the extent that they would affect how a reasonable person in the position of the individual being questioned would have gauged the breadth of his freedom of action. *Stansbury v. California*, 511 U.S. 318, 324, 128 L. Ed. 2d 293, 299, 114 S. Ct. 1526, 1529 (1994); *Patel*, 313 Ill. App. 3d at 604. Moreover, where the investigating officer is aware of particular characteristics or traits of the individual that make him or her particularly vulnerable to the impression that he or she is in custody, and the officer exploits those characteristics in questioning, that, too, is a relevant factor in determining whether the individual is "in custody" for purposes of *Miranda*. See *United States v. Erving L.*, 147 F.3d 1240, 1248 (10th Cir. 1998) (limited capacity to understand, and other particular personality traits, may be relevant to custody question where officers are aware of those traits and they influence the actions of the officers); *cf. United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1999) (no indication that the police were aware of defendants' mental deficiencies and the officers repeatedly advised defendants that they were not under arrest and did not have to answer questions).

As we consider the age, intelligence, and mental makeup of the accused—and an investigating officer's awareness and exploitation of those characteristics—in our examination of the circumstances surrounding the interrogation, so those factors are analytically intertwined with the reasonable-person prong of the custodial question. Indeed, other courts have incorporated these factors into the reasonable-person standard itself in varied circumstances involving investigatory interaction between the police and citizens. See *United States v. Zapata*, 997 F.2d 751, 759 (10th Cir. 1993) (notwithstanding reasonable-person standard, attributes such as age,

education and intelligence of the accused have been recognized as relevant in determining whether consent was voluntary); *United States v. Little*, 18 F.3d 1499, 1505 (10th Cir. 1994) (in applying the reasonable-person standard to a consent to search issue, the "particular personal traits *** of the defendant" may become relevant *** if the police officer knows of the personal traits or characteristics and they influence his or her conduct); *Commonwealth v. Reid*, 571 Pa. 1, 28, 811 A.2d 530, 546 (2002) (when considering whether consent was voluntarily given, a "reviewing court should evaluate the characteristics of the accused, the interaction between the accused and the police, and assess how a reasonable person in the accused's shoes would have reacted to that interaction"); *United States v. Montgomery*, 14 F.3d 1189, 1194 (7th Cir. 1994) (even when examining a noncustodial interrogation, a court should look to "the characteristics of the accused and the details of the interrogation" to determine whether a reasonable person would have felt coerced); *United States v. Cichon*, 48 F.3d 269, 276 (7th Cir. 1995) (same); *United States v. Oliver*, 142 F. Supp. 2d 1047, 1051 (N.D. Ill. 2001) (same).

The justification for incorporating general and readily discernible characteristics of the subject-actor into the reasonable-person standard logically must apply in this situation as well. If, as is the case, we are concerned with what a reasonable person "in the defendant's shoes" (see *Lucas*, 132 Ill. 2d at 418) would have thought about his or her freedom of action, the reasonable person we envision must at least wear comparable footwear; otherwise, we ought to simply abandon the legal charade that the defendant's characteristics, perspective and perception matter at all.

Recognizing this principle, the Ninth Circuit Court of Appeals has suggested the applicable standard should indeed be modified in this context, where a juvenile is

concerned, to reflect what a reasonable juvenile would have thought in defendant's position. *Alvarado v. Hickman*, 316 F.3d 841, 848 (9th Cir. 2002), *cert. granted*, 439 U.S. 986, 156 L. Ed. 2d 703, 124 S. Ct. 45 (2003). In its analysis, the *Alvarado* court first recited the now firmly established legal principle that "juvenile defendants are, in general, more susceptible to police coercion than adults; as such, due process demands that a defendant's juvenile status be taken into consideration when determining the proper procedural safeguards that attach to a custodial interrogation." *Alvarado*, 316 F.3d at 843. The *Alvarado* court then reasoned, "If a juvenile is more susceptible to police coercion during a custodial interrogation, then the same juvenile is also more susceptible to the impression that he is, in fact, in custody in the first instance." *Alvarado*, 316 F.3d at 843. Next, the court seemingly sanctioned a reasonable-juvenile standard to be applied to the determination of custodial interrogation. The *Alvarado* court quoted, with special emphasis, from *Erving L.*, 147 F.3d at 1248:

> " 'Given these facts, *a reasonable juvenile* in E.L.'s position would not have believed that the officers had curtailed his freedom of movement to a degree associated with formal arrest.' " (Emphasis in original.) *Alvarado*, 316 F.3d at 848, quoting *Erving L.*, 147 F.3d at 1248.

The *Alvarado* court then observed, "When we survey the landscape of state court decisions, we note that every jurisdiction that has squarely addressed the issue has ruled that juvenile status is relevant to the 'in custody' determination, either as a factor in the totality of circumstances test, or by way of *modification to the reasonable person standard*." (Emphasis added.) *Alvarado*, 316 F.3d at 850 n.5 (collecting cases). See generally *State v. Jason L.*, 129 N.M. 119, 126, 2 P.3d 856, 863 (2000) (characteristics such as whether the person being questioned is a child or an adult are objective and relevant to the question of whether a reasonable person

would feel free to terminate questioning and leave); *Ramirez v. State*, 739 So. 2d 568, 574 (Fla. 1999) (applying "reasonable juvenile" standard to determine whether defendant would have believed he was in custody at the time of the interrogation); *State v. Smith*, 546 N.W.2d 916, 923 (Iowa 1996) ("it is appropriate to consider the age of the defendants as an additional factor in making a determination as to custody status"); *In re D.A.R.*, 73 S.W.3d 505, 511 (Tex. Ct. App. 2002) ("We believe the facts here establish that a reasonable thirteen-year-old would have believed he was in custody"); *In re Loredo*, 125 Or. App. 390, 394, 865 P.2d 1312, 1315 (1993) (custodial question entailed inquiry into what a reasonable person of the child's age, knowledge and experience would have thought); *In re Robert H.*, 194 A.D.2d 790, 791, 599 N.Y.S. 621, 623 (1993) ("[A] reasonable 15-year-old, in the position of Robert, would not have believed he was free to leave the scene"); *In re Rennette B.*, 281 A.D.2d 78, 85, 723 N.Y.S. 31, 37 (2001) (same). In this context, our own appellate court has modified the reasonable-person standard, where a juvenile is involved, considering what a reasonable juvenile would have thought about his or her custodial status. See *In re J.W.*, 274 Ill. App. 3d 951, 960 (1995) ("Although J.W. had not been formally arrested *** a reasonable 14-year-old person would have been entitled to believe *** he was in police custody and not free to leave"). See also *People v. Armstrong*, 318 Ill. App. 3d 607, 614-15 (2000).

The same rationale that requires modification of the reasonable person standard to take into account the general characteristics of juveniles also militates in favor of such a modification where the mentally retarded are concerned. "[M]ental retardation may have a significant impact on an individual who finds himself involved with the criminal justice system, particularly in the context of confessions and interrogations. *** Many mentally re-

tarded people may be less likely to withstand police coercion or pressure due to their limited communication skills, their predisposition to answer questions so as to please the questioner rather than to answer the question accurately, and their tendency to be submissive." L. Entzeroth, *Putting the Mentally Retarded Criminal Defendant to Death: Charting the Development of a National Consensus to Exempt the Mentally Retarded from the Death Penalty*, 52 Ala. L. Rev. 911, 917 (2001). See also P. Hourihan, *Earl Washington's Confession: Mental Retardation and the Law of Confessions*, 81 Va. L. Rev. 1471, 1473 (1995) ("Mentally retarded persons are more susceptible to coercion, more likely to confess falsely, and less likely to understand their rights than people of normal intellectual ability"). Just as they are more susceptible to police coercion during a custodial interrogation, the mentally retarded are also more susceptible to the impression that they are, in fact, in custody in the first instance. The circumstances of the instant case amply demonstrate the point.

Including the initial interrogation of June 25, 1993, defendant was questioned by police six times before she was formally arrested: four times at a police facility, once at her home and once at the scene of the crime. The police enlisted the aid and consent of Cameron—who apparently represented herself to be defendant's sister and legal guardian—in order to question defendant. Cameron acted as a translator of sorts and actually facilitated the police interrogation. Her role in the process of interrogation is not what we characterize as that of a family member concerned with defendant's welfare. It is not evident from the record that defendant ever verbally assented to police interrogation. On every occasion that she was questioned outside her home, the police transported defendant. Two detectives were always present during the interrogations. Although it is not clear from the record whether defendant

was present when Winstead advised Cameron that defendant was a suspect, even a mentally retarded suspect might well have regarded herself as such after Winstead had expressed disbelief of her version of events and had asked her to take a polygraph examination. We also note that Winstead for the first time read defendant her *Miranda* rights on June 25, something he had not done in previous encounters. We have no doubt whatsoever that a reasonable person with defendant's mental capacity would have believed he or she was in custody and not free to leave the police station.

In fact, our research has disclosed a case involving similar circumstances, a person of apparently *normal* intelligence, and a determination that the interrogation *was* custodial. In *United States v. Wauneka*, 770 F.2d 1434 (9th Cir. 1985), defendant was questioned by law enforcement officials on four occasions, three on the day of his confession. On the first three, he was transported from his residence to a Bureau of Indian Affairs office by plainclothes agents. When he was picked up the last time for further questioning, Wauneka was transported by two armed officers and was placed in a large conference room with four or five officers who each had an opportunity to question him. The hour-long interrogation eventually turned accusatory. During a break, Wauneka, who was then 18 years old, broke down crying. FBI agents resumed the questioning despite the fact that Wauneka was visibly shaken by this ordeal and eventually obtained a confession. Wauneka had no means of transportation, and he was never offered an opportunity to leave the Bureau's office prior to his confession. On these facts, the court of appeals upheld a district court ruling that Wauneka was "in custody" for purposes of *Miranda* when he confessed. The court stated, "A reasonable innocent person in such circumstances probably would have concluded that he was not free to leave." *United States v. Wauneka*, 770 F.2d 1434, 1438-39 (9th Cir. 1985).

Like Wauneka, the defendant in this case was repeatedly taken by officers to a law enforcement facility and questioned. As in *Wauneka,* the instant defendant was never told she could leave the station when she wished; she was taken home by the police when they were finished with her. By the time of the encounter on June 25, the atmosphere of the interrogation had turned accusatory: defendant had taken a polygraph examination and had been designated a suspect by Winstead. However, defendant, unlike Wauneka, is mentally retarded. She was only at the police station because her purported guardian/sister agreed to police requests that she accompany them there. Her options, no doubt, seemed very limited indeed.

Under the circumstances, a reasonable person with defendant's mental capacity would not have felt free to leave. In this case, the police knowingly exploited defendant's mental retardation. While the custody inquiry may not "place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question" (*Berkemer*, 468 U.S. at 442 n.35, 82 L. Ed. 2d at 336 n.35, 104 S. Ct. at 3151 n.35), neither does it sanction the exploitation of known frailties or idiosyncracies by the government. Modification or refinement of the reasonable person standard is appropriate where, as here, such exploitation has occurred. We conclude that the circuit court erred in ruling defendant was not in custody when she allegedly gave an inculpatory statement to Detective Winstead on June 25, 1993.

Having determined that Winstead's interrogation of defendant on June 25 was custodial, we now address the question of whether defendant knowingly and intelligently waived her *Miranda* rights. Custodial interrogation is, of course, inherently coercive and " 'trades on the weakness of individuals.' " *Dickerson v. United States*, 530 U.S. 428, 435, 147 L. Ed. 2d 405, 414, 120 S. Ct.

2326, 2331 (2000), quoting *Miranda v. Arizona*, 384 U.S. 436, 455, 16 L. Ed. 2d 694, 712, 86 S. Ct. 1602, 1618 (1966). As we have noted previously herein, it is generally recognized that the mentally retarded are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights. See M. McCloud, *Words Without Meaning: The Constitution, Confessions and Mentally Retarded Suspects*, 69 U. Chi. L. Rev. 495, 503, 538 (2002); L. Entzeroth, *Putting the Mentally Retarded Criminal Defendant to Death: Charting the Development of a National Consensus to Exempt the Mentally Retarded from the Death Penalty*, 52 Ala. L. Rev. 911, 917 (2001). P. Hourihan, *Earl Washington's Confession: Mental Retardation and the Law of Confessions*, 81 Va. L. Rev. 1471, 1473 (1995).

However, evidence of a defendant's limited mental or intellectual capacity at the time of a confession, alone, does not establish that he or she was incapable of waiving *Miranda* rights. Limited intellectual capacity is one of several factors to be considered in this regard. *People v. Foster*, 168 Ill. 2d 465, 476 (1995); *People v. Mahaffey*, 165 Ill. 2d 445, 462 (1995).

Nevertheless, "[w]aiver of a constitutional right is valid only if it is clearly established that there was 'an intentional relinquishment or abandonment of a known right ***.' " *People v. Johnson*, 75 Ill. 2d 180, 187 (1979), quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023 (1938). See *People v. McClanahan*, 191 Ill. 2d 127, 137 (2000). Waivers must not only be voluntary, but must be knowing and intelligent acts in the sense that they are done with sufficient awareness of the relevant circumstances and likely

consequences. *McClanahan*, 191 Ill. 2d at 137; *Bernasco*, 138 Ill. 2d at 364-65.

A valid waiver of *Miranda* rights must be knowingly and intelligently made. *Bernasco*, 138 Ill. 2d at 364-65. A criminal suspect is not required to know and understand every possible consequence of a waiver of the Fifth Amendment privilege for it to be knowingly and intelligently made. *Colorado v. Spring*, 479 U.S. 564, 574, 93 L. Ed. 2d 954, 966, 107 S. Ct. 851, 857 (1987). However, in order to effect an intelligent and knowing waiver of *Miranda* rights, a defendant must have " ' "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." ' " *Bernasco*, 138 Ill. 2d at 360, quoting *Patterson v. Illinois*, 487 U.S. 285, 292, 101 L. Ed. 2d 261, 272, 108 S. Ct. 2389, 2395 (1988). The defendant need not understand far-reaching legal and strategic effects of waiving his or her rights or appreciate how widely or deeply an interrogation may probe; however, the defendant must at least understand basically what those rights encompass and minimally what their waiver will entail. *Mahaffey*, 165 Ill. 2d at 462, quoting *Bernasco*, 138 Ill. 2d at 363. Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, "including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. at 464, 82 L. Ed. at 1466, 58 S. Ct. at 1023; *In re J.J.C.*, 294 Ill. App. 3d 227, 233 (1998).

It is all too obvious, as the trial court concluded, that the defendant in this case did not knowingly and intelligently waive her *Miranda* rights. The State does not even attempt to argue that point. Winstead advised defendant of her *Miranda* warnings from a standard form without additional explanation. Defendant made no verbal response; she merely nodded her head in an affirmative manner. Winstead later recalled that Cameron told

defendant something to the effect of: "He's telling you that you don't have to talk to me and that you're not going to be in trouble or something." Defendant nodded her head in agreement and "seemed to understand what her sister was saying." Defendant never verbally indicated that she understood, and she did not sign a waiver form. Indeed, it is unclear to what extent defendant ever responded to, or communicated with, Winstead. He acknowledged that Cameron "initially" acted as an "interpreter," and it is obvious from his testimony that she was still acting in that capacity on June 25, 1993, despite Winstead's suggestion to the contrary: "After a while, after I talked to [defendant] somewhat, I could begin to understand or she'd answer me or she wouldn't." That statement is hardly a testament to an acceptable level of communication and understanding between Winstead and defendant. The record does not indicate whether Winstead's questions to defendant were suggestive or leading, or whether they called for a narrative response.

Assistant State's Attorney Gonsalves testified that he advised defendant of her *Miranda* warnings, and she was "just quiet at that point." Defendant did not respond verbally when she was asked if she understood her rights. Defendant simply nodded her head affirmatively after Gonsalves finished giving her the *Miranda* warnings. Cameron was in the room, but did not say anything. Gonsalves testified that defendant was responsive to his questions during the interrogation, but he conceded that communicating with defendant was "difficult" and "slow." The record does not indicate whether Gonsalves' questions to defendant were suggestive or leading, or whether they called for a narrative response. It does not appear from the record that defendant had any prior experience with the criminal justice system.

Dr. Philip Pan characterized defendant's mental impairment as moderate mental retardation. He deter-

mined her condition was profound to a degree that she was unfit to stand trial. He noted that four other psychiatrists had reached the same conclusion. Pan rendered his opinion that defendant was incapable of understanding *Miranda* warnings. He noted that her thinking was "idiosyncratic," meaning she was often "not on the same page" as the person questioning her. She would frequently answer questions in a completely irrelevant manner.

Dr. Linda Wertzel, a clinical psychologist, examined defendant in 1994 and testified to her findings. Wertzel concluded that defendant was mentally retarded with an IQ of 54. Wertzel stated that defendant could provide only "simple answers to direct questions and really did not provide a narrative of information." Defendant functioned, mathematically, at a kindergarten level. Defendant was unsure if she had ever gone to school. She could not read or write. Wertzel determined that defendant could only express herself at a "very simple childish level" and she could not comprehend more than a one-step command. Defendant's comprehension of her circumstances was marginal, and she was unable to understand her *Miranda* rights.

Wertzel examined defendant again in October of 1999 and concluded defendant remained unable to understand her *Miranda* warnings. Wertzel then administered the Peabody Picture Vocabulary Test to defendant. Defendant scored the age equivalent of a five-year-old. After her 1999 examination of defendant, Wertzel determined it was "highly unlikely" that defendant ever had the ability to comprehend or waive *Miranda* rights. Wertzel described defendant as "sort of like a child, *** unsure of what is real and what is imagined, what is an actual memory, what is told to them." Moreover, she stated that defendant does not tolerate stress very well and is "suggestible." Wertzel described more than one instance

where she was able to lead defendant in the questioning to get the response desired.

The uncontroverted testimony in this case demonstrates that defendant did not knowingly and intelligently waive her *Miranda* rights. No other conclusion is possible based on the evidence adduced at the suppression hearing. Defendant was subjected to repeated interrogation that was actually *facilitated* by her purported sister/guardian. By repeatedly taking defendant where they wanted, when they wanted, the police reinforced their authority and control over her. Defendant apparently had no prior experience with the criminal justice system. She was clearly a suspect by the time she took a polygraph test and was thereafter questioned on June 25, 1993. The experts who testified were unanimously of the opinion that defendant was incapable of understanding and waiving her *Miranda* rights. Aside from the State's testimony regarding defendant's ambiguous nods, there was no evidence even suggesting that defendant waived her rights. In fact, the minimal level of communication between law enforcement officials and the defendant throughout the investigation of this case is a matter of great concern to this court and should have been to the officers involved, who proceeded to repeatedly question defendant despite her obvious impairment and vulnerability. We note that the degree of defendant's mental impairment is comparable to that of the defendants in *Bernasco* and *People v. Robinson*, 301 Ill. App. 3d 634 (1998). In both cases, confessions were suppressed. *Bernasco*, 138 Ill. 2d at 350-51; *Robinson*, 301 Ill. App. 3d at 643.

It has been said that "a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation."

*Escobedo v. Illinois*, 378 U.S. 478, 488-89, 12 L. Ed. 2d 977, 985, 84 S. Ct. 1758, 1764 (1964). Custodial interrogation trades on the weakness of individuals (*Dickerson*, 530 U.S. at 435, 147 L. Ed. 2d at 414, 120 S. Ct. at 2331, quoting *Miranda*, 384 U.S. at 455, 16 L. Ed. 2d at 712, 86 S. Ct. at 1618); the young and mentally infirm are most vulnerable. The potential for abuse is obvious, as is the need for adequate safeguards. We believe this case amply demonstrates the point.

Both confessions defendant allegedly gave on June 25, 1993, were made under circumstances custodial in nature. As defendant was incapable of knowingly and intelligently waiving her *Miranda* rights, both statements should have been suppressed. We express no opinion regarding the admissibility of statements defendant may have made prior to that date. The State's argument on appeal concerns only defendant's "confession to the detectives." We, therefore, affirm the judgment of the appellate court insofar as we reverse and remand for further suppression proceedings and a new discharge hearing. We modify the appellate court's judgment to the extent that we limit the scope of any further suppression proceedings to statements defendant may have made prior to June 25, 1993.

Given our disposition, we need not reach the issue upon which the appellate court disposed of this case. We may affirm the result below on any basis that is supported by the record. *People v. Huff*, 195 Ill. 2d 87, 91 (2001); *In re Application of the Cook County Treasurer*, 185 Ill. 2d 428, 436 (1998).

For the reasons stated, we affirm the judgment of the appellate court as modified and remand to the circuit court for further proceedings consistent with this opinion.

*Affirmed as modified;*
*cause remanded.*