2020 IL App (1st) 190986-U

SIXTH DIVISION
September 30, 2020

No. 1-19-0986

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 03080 (01) |
| | ) | |
| TYRONE CLAY, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1    *Held*:    Trial court's order suppressing defendant's statement affirmed where finding that defendant did not knowingly and intelligently waive his *Miranda* rights was not against the manifest weight of the evidence and court did not misapply the law.

¶ 2    Defendant Tyrone Clay was arrested and interrogated in connection with the shooting of an off-duty Chicago police officer and, after two days of interrogation, gave inculpatory statements. Mr. Clay filed a motion to suppress his statements and, after a lengthy hearing, the trial court granted his motion to suppress. The State now appeals that ruling, arguing that (1) the ruling

was against the manifest weight of the evidence, and (2) the trial court committed an error of law by basing its ruling in part on the defense expert's statement that a knowing waiver differs from an intelligent waiver. For the following reasons, we affirm the suppression order entered by the trial court.

¶ 3                                    I. BACKGROUND

¶ 4    Mr. Clay was charged, along with codefendant Edgardo Colon, who is not party to this appeal, with first degree murder, armed robbery, aggravated battery, and burglary in connection with the December 29, 2011, shooting death of off-duty Chicago police officer Clifton Lewis. Mr. Clay was arrested in the early morning hours of January 5, 2012, and was interrogated by police throughout that day, the next, and into the early morning hours of January 7, 2012. By the end of this lengthy custodial interrogation, Mr. Clay made inculpatory statements, acknowledging his role in killing Officer Lewis.

¶ 5    Mr. Clay filed a motion to suppress his statements on March 25, 2015, arguing that "due to his limited intelligence and verbal comprehension, he was unable to make a knowing[ ] and intelligent waiver of his *Miranda* rights." Mr. Clay also argued that the statements should be suppressed because the interrogation continued after he invoked his rights to counsel and to be silent, but his "will was overborne" by coercion.

¶ 6    The hearing on the motion to suppress took place over several court dates, beginning on December 7, 2017. As the trial court later observed, the hearing on the motion essentially came down to "dueling experts": the State presented the testimony of an expert in forensic psychiatry, Dr. Stafford Henry, while the defense presented the testimony of an expert in forensic psychology, Dr. Bruce Frumkin. The parties also presented several video clips of portions of Mr. Clay's electronically recorded interview (ERI) with the police.

2

¶ 7                                A. Mr. Clay's Interrogation

¶ 8      Mr. Clay's interrogation began at approximately 7 a.m. on January 5, 2012, and continued into the early morning hours of January 7, 2012. Mr. Clay was read his *Miranda* rights by detectives soon after his interrogation began. He was told, "[a]ll right, you know what your rights are? I'm gonna, after I give you your rights, you have to say yes so I understand that you—you understand what I'm saying." Mr. Clay then answered "[y]es" when asked if he understood each of the four rights. Mr. Clay was also read his rights one at a time on at least three occasions throughout the rest of the interrogation, and each time he indicated he understood his rights.

¶ 9      At 1:59 p.m. on January 5, after Mr. Clay repeatedly said that he did not do anything, he said, "I'm gone from I don't even want to talk no more," to which the detective responded, perhaps misunderstanding what Mr. Clay had said, "[y]our girlfriend? You've got more important things to worry about. I told you we're gonna be fair as long as you're fair." The conversation continued and at 2:01 p.m. on January 5, Mr. Clay said, "[m]an, I'm gone (inaudible) I don't need to talk no more 'cause it ain't doing nothing but blowing me man 'cause I know I ain't do it. Real." The detective responded, "[y]ou might've went there just to rob the place," and Mr. Clay said, "I ain't rob nothing, I'm innocent until proven guilty." Mr. Clay continued to insist he had not done anything.

¶ 10     At 2:10 p.m., the following exchanged occurred:

> "[DETECTIVE] Q: You gotta do some [soul-]searching. Think about your mother. Think about your kids. Think about your girlfriend.
>
> [MR. CLAY] A: I ain't worried about them I'm gonna see them. 'Cause I ain't do nothing.
>
> Q: Where you gonna see them?

A: Call my momma tell her get me a lawyer Joe 'cause I ain't do nothing."

And then, just after, at 2:11 p.m., Mr. Clay said, "I don't even want to talk." At this point, the detectives left the room for approximately two-and-a-half hours. At 4:42 p.m., a detective entered the room, introduced himself, and then read Mr. Clay his *Miranda* rights one at a time, and after each right, Mr. Clay indicated he understood. The detective then started talking about Mr. Clay's polygraph test, and the conversation proceeded on.

¶ 11    Mr. Clay maintained that he was not present in the car the night of the shooting for approximately another nine hours. At 2:01 a.m. on January 6, 2012, the detective told Mr. Clay that the situation was going to play out with Mr. Clay "taking the weight of this whole thing," and Mr. Clay responded:

> "[MR. CLAY] A: I ain't taking no weight of nothing, Joe, I'll get me a lawyer—
>
> [DETECTIVE] Q: You are going to.
>
> A: —'cause I ain't going. I ain't going man, I'm not going.
>
> Q: You don't have that option right now.
>
> A: Man, I ain't going.
>
> Q: You don't have that option."

¶ 12    Shortly after, at 2:08 a.m., Mr. Clay made his first inculpatory statement, admitting that he was in a car behind Mr. Villa's car when they parked at Austin and Chicago and he continued:

> "[MR. CLAY] [A:] So he came out, we parked right there, and, I'm sitting in the car. And they hop out to go in the liquor store. So they went in the store, they got to arguing with some people right there like some guys, and, I don't know if he was security, I don't know, a regular officer, I don't know. So he—he came out to try to like, you know what I'm saying, to see what was going on. And then mother-f*** just—

Q: Is this on Austin?

A: Yeah, mother-f*** just got to busting.

Q: Who did?

A: [Mr. Villa]. I'm looking dead at him. I didn't do s***. No lie."

The interrogation continued into the early morning hours of January 7, during which time Mr. Clay eventually admitted that he and Mr. Villa went into the store with guns to rob it, he saw Mr. Villa shoot the security guard and take the security guard's gun, he grabbed some money from by the register, and then they both ran out of the store back to the car that Mr. Colon was driving.

¶ 13                              B. Dr. Stafford Henry

¶ 14    Dr. Henry testified that in preparation for his examination of Mr. Clay, he reviewed documents including records from the Chicago Police Department, the recording and transcript of Mr. Clay's interrogation by the police, and the report from Dr. Frumkin. Dr. Henry met with Mr. Clay on August 9, 2016.

¶ 15    Dr. Henry's conclusion, after examining Mr. Clay and the relevant documents, was that at the time of Mr. Clay's January 2012 arrest and questioning, "Mr. Clay possessed the capacity to understand and knowingly waive his *Miranda* warnings."

¶ 16    Dr. Henry testified that the factors that are typically identified for determining whether someone has an understanding of *Miranda* include prior contact with the criminal justice system, the presence of psychiatric illness, level of intoxication, "adaptive functioning," the presence of medical illnesses that may play a role in one's capacity to understand *Miranda*, and exposure to *Miranda* either on television or seeing family members or friends being arrested.

¶ 17    Dr. Henry explained that "adaptive functioning" is "how [someone] go[es] about navigating their world," including money management skills, the ability to take care of themselves,

the extent of social interactions, and communication abilities. Dr. Henry said Mr. Clay's adaptive functioning was "normal." Mr. Clay was in a relationship and had a "very good understanding of money management" because he knew he needed to pay his cable bill and his rent, and he was also able to "formulate very socially, culturally appropriate social interactions."

¶ 18     Dr. Henry testified that Mr. Clay was able to articulate an understanding of *Miranda* during his examination. According to Dr. Henry, Mr. Clay said that *Miranda* was " 'something you have,' " that "its origin is 'from the courts,' " and that it applies " 'when the police arrest you.' " Dr. Henry testified that Mr. Clay said the purpose of *Miranda* was " '[s]o you won't do something you ain't got no business doing.' " Mr. Clay told Dr. Henry that he had known his *Miranda* rights since he became an adult at approximately 21 years old because he had been read his *Miranda* rights 10 times previously and also had some understanding from watching television. Mr. Clay indicated to Dr. Henry that when he was arrested, he was aware that he had the right to remain silent and that statements could be used against him in a court of law. Mr. Clay also told Dr. Henry that he told the police to call his mother to get him a lawyer.

¶ 19     Dr. Henry testified that the fact that Mr. Clay told one story to the police, then later told a different story that was inculpatory, indicated that Mr. Clay "had the capacity to be self[-]serving" and that he was "aware he[ was] being questioned for a crime and then he had the cognitive ability in the moment to come up with an explanation, which would place him not at the scene of the crime." Dr. Henry said that it showed that Mr. Clay had "intact executive functioning." Dr. Henry also testified that Mr. Clay said he regretted giving the second statement, and said that "if he had kept his mouth shut there probably wouldn't have been a statement," which indicated to Dr. Henry that Mr. Clay was aware at the time that he had the right to remain silent. Dr. Henry also twice asked Mr. Clay why he gave an inculpatory statement even though he was given and understood

his *Miranda* rights—the first time "he said he was scared. He did it out of fear," and the second time he said, "I don't know. I don't even know, that's the best answer I can give you."

¶ 20    Dr. Henry also testified that Mr. Clay was not suggestible based on several factors, including the inconsistent stories that Mr. Clay told. Dr. Henry testified on direct examination that Mr. Clay had "normal intelligence." Dr. Henry pointed out that in the interrogation video, Mr. Clay said he knew he could get a lawyer "and having done so in the past allowed him to beat a case." To Dr. Henry, this showed Mr. Clay "was critically aware that a lawyer could assist him."

¶ 21    On cross-examination, when asked about whether Mr. Clay's IQ factored into his assessment, Dr. Henry said, "[i]f it was available to me in Dr. Frumkin's report, it was a factor to be considered." Dr. Henry acknowledged on cross examination that he was not sure whether Mr. Clay was of "normal intelligence" but agreed that an IQ of 67 "would not be consistent with normal intelligence" and would be in the "mild to moderate range" of intellectually challenged.

¶ 22                              C. Dr. Bruce Frumkin

¶ 23    Dr. Frumkin testified that he saw Mr. Clay on two separate days—he spent 7.75 hours with Mr. Clay on April 24, 2013, and 3.25 hours on June 16, 2013. During those visits, he conducted clinical interviews with Mr. Clay and administered or readministered a variety of tests. Dr. Frumkin testified that he also reviewed the police reports, Mr. Clay's arrest history, and the interrogation recording and transcripts. After completing his report, Dr. Frumkin reviewed Dr. Henry's report, viewed the video of Dr. Henry's examination of Mr. Clay, and interviewed Mr. Clay's mother, Lovetta Jones.

¶ 24    In Dr. Frumkin's opinion, at the time of the police interrogation, "for a variety of reasons, Mr. Clay was not able to make a knowing and intelligent waiver of his rights." Dr. Frumkin testified that he did not think Mr. Clay appreciated or understood the *Miranda* warnings.

¶ 25    Dr. Frumkin based his opinion on many factors, including Mr. Clay's IQ. Dr. Frumkin testified that Mr. Clay received a score of 66 on the verbal comprehension index of the IQ test, which is in the lower one-percentile range—Dr. Frumkin explained that meant that "99 percent of the population is brighter than [Mr. Clay] is verbally." Mr. Clay received a 77 on the memory index, which is in the lower six-percentile range. Dr. Frumkin explained that these are the important IQ sub tests with respect to understanding and appreciating *Miranda* because "*Miranda* has to do with verbal abstract reasoning and knowledge of vocabulary words and general knowledge about the world and issues having to do with memory." According to Dr. Frumkin, "every research on *Miranda* understanding and appreciation talks about how there is a strong correlation between low IQ and lack of understanding." Dr. Frumkin explained: "there is no one IQ that's automatically going to render someone incompetent to waive *Miranda*." He further stated that a person with intellectual limitations would possibly, but not likely, understand and make an intelligent waiver of *Miranda* and that "there is a lot of research to show that those of lower intelligence understand and appreciate *Miranda* much less than people of higher intelligence." Dr. Frumkin also testified that he did not believe Mr. Clay malingered on the IQ tests because Mr. Clay "got almost—he got the exact same scores on verbal comprehension and working memory index," which is very hard to do intentionally.

¶ 26    Dr. Frumkin explained that for a knowing wavier, he considers "what the person understands about the warnings or the rights, as well as how the warnings or rights were administered to that person." An intelligent waiver, on the other hand, "has to do with the decision making capacity, how well one can appreciate the significance of the rights based upon what they understand about the legal system" or "appreciating the nature and consequences of waiving the rights."

¶ 27    Dr. Frumkin testified that he administered a number of malingering or effort tests. Dr. Frumkin explained that some of the tests revealed that on April 24, Mr. Clay was "acquiescent" in his answers, or was not putting in the right amount of effort to "exaggerate [the] intellectual deficiencies that he did have." Some of the tests he administered on April 24 also showed inconsistent results that suggested possible "so-called malingering." He asked Mr. Clay about these results the second time they met, and Mr. Clay said that some of the material had been getting too hard for him, so he "gave up too quickly," but also indicated that people in his cell "told him to dumb things down." As a result of the possible malingering, Dr. Frumkin readministered some of the malingering tests and some of the other tests in June. Dr. Frumkin testified that the June tests revealed that there was "no reason to believe [Mr. Clay] wasn't giving his best effort and giving an honest portrayal of himself."

¶ 28    Three of the tests Dr. Frumkin administered to Mr. Clay on April 24 were intended to specifically test Mr. Clay's ability to understand or to make an intelligent waiver of *Miranda*—the comprehension and *Miranda* rights (CMR) test, the comprehension and *Miranda* rights recognition (CMR-R) test, and the function of rights and interrogation (FRI) test. Mr. Clay did "poorly" on all of these tests, and Dr. Frumkin did not believe Mr. Clay was malingering on these tests.

¶ 29    Dr. Frumkin also administered tests to assess Mr. Clay's suggestibility—the "Gudjohnsson suggestibility scales" (GSS) test, a different version of the test on each date. Mr. Clay's suggestibility score put him in the 98th-percentile range for suggestibility in April and 99.9th-percentile range in June. Dr. Frumkin explained the significance of this result, to him, was "that this person is much more likely to give in to either misleading information or false information, or false information that's implied, and much more likely to eventually change to a different response

when there's pressure. And it's significant that this interrogation lasted, you know, close to 22 hours."

¶ 30    Dr. Frumkin acknowledged that the police read the *Miranda* warnings to Mr. Clay one at a time, but said that they were read "rather quickly," which was a "factor that would make it more difficult to understand." Dr. Frumkin further testified that he did not "put any weight on the fact that" Mr. Clay said he understood each right for multiple reasons: a person may say they understand when they do not because they are embarrassed to admit otherwise, a person may think they understand when they actually do not, "people with intellectual deficiencies tend to mask their intellectual deficiencies" by indicating they understand when they really do not, and the nature of interrogation includes "[t]he demand characteristic for the person to indicate that they understand."

¶ 31    Dr. Frumkin testified that Mr. Clay did not have an understanding or appreciation of *Miranda* even after Dr. Frumkin spent 45 minutes explaining *Miranda*-related issues to him. Dr. Frumkin explained, "[h]e is not making the connection between not having to speak to the police and his right to counsel." Dr. Frumkin testified that Mr. Clay knew he had a right to an attorney based on his spontaneous mentions of it during interrogation, but:

> "it's almost like this is some sort of magic term to him, that if he says, I am going to get an attorney, he's expecting that would be sufficient for everything else to fall into place, um, but he's not connecting the fact that he doesn't have to speak to the police until he speaks to the attorney, and that he could just refuse to talk until he is able to consult with one."

Dr. Frumkin explained that when Mr. Clay said, "I don't even want to talk no more," Mr. Clay "doesn't have the intellectual resources to be able to assert himself and just not talk, despite him saying multiple times that he doesn't want to talk anymore, or that, he, you know, wants to speak

to a lawyer."

¶ 32    Dr. Frumkin testified that he reviewed Dr. Henry's report to see if he had missed or overlooked anything and that, if he had, he would have reevaluated his own opinion. But Dr. Frumkin said that Dr. Henry's report did not change his prior opinion and that, if anything, it "[e]ven more strongly affirmed" his opinion.

¶ 33    Dr. Frumkin explained where he disagreed with Dr. Henry. Dr. Frumkin disagreed that one's intelligence is not relevant to an understanding or appreciation of *Miranda*. Dr. Frumkin explained that when you control for IQ, "people with mental illness, severe mental illness, don't understand *Miranda* less than people without mental illness." Dr. Frumkin also did not put much weight in Mr. Clay's criminal history because there were "a number of research studies that show that there is no simple correlation between how many times one has been arrested and how well one understands *Miranda* rights." And while Dr. Henry believed that a knowing waiver and an intelligent waiver of *Miranda* were the same thing, Dr. Frumkin believed they were different, explaining:

> "Someone could make a knowing waiver, understand the rights completely, but not appreciate the significance of the rights based upon their misunderstanding of how the legal system works. Not to mean that they're incompetent to stand trial, but they have misconceptions about how the rights apply."

¶ 34    Dr. Frumkin also disagreed with Dr. Henry that adaptability was related to *Miranda*, saying that some adaptive functioning "could be considered part of it," but that "someone could have low adaptive functioning and understand *Miranda*, and someone could have high adaptive functioning and not understand *Miranda*."

¶ 35    On cross-examination, the State showed Dr. Frumkin clips from Mr. Clay's interrogation

where Mr. Clay said he understood his rights, and asked if it was possible Mr. Clay said he understood them because he did understand, and Dr Frumkin responded, "I think it's highly unlikely with someone of his IQ and the responses he gave to me during my examination of *Miranda*, and even after 45 or 50 minutes or an hour, he still had some misconceptions about *Miranda* despite all that length of time."

¶ 36    The trial court issued its judgment on the motion to suppress on February 4, 2019. In doing so, the court noted that the parties largely agreed to the facts and that "[i]t's really the interpretation what these facts mean in the context of whether [Mr. Clay]'s statement should be suppressed."

¶ 37    The court recognized that that it was required to "look at this under a totality of the circumstances and that totality can and does include factors like [Mr. Clay]'s age, intelligence, background, experience, education, mental capacity, physical condition at the time of the questioning along with the duration and things like the legality of the detention."

¶ 38    The court found that the key issue was whether Mr. Clay voluntarily waived his *Miranda* rights. The court carefully went through the evidence as presented by each expert. The court then stated:

> "This is a unique situation in the evidence and what the Court considers, but the sum of what I have considered and weighed, it is the finding of the Court that [Mr. Clay] did not make a knowing and intelligent waiver of his *Miranda* warnings, and it is based primarily on the testimony of Dr. Frumkin and his analysis and how he explains that even [Mr. Clay], in saying the words that he said he himself can believe that he understands the warnings but he lacks the ability to put together the concepts that are required to stop the police questioning despite his efforts, despite him continuing to talk after attempting to cut off the questioning, or so the Court believes.

So the sum of this Court's analysis and finding is that [Mr. Clay], based on the evidence, did not make a knowing and intelligent waiver of his rights."

¶ 39    On February 28, 2019, the State filed a motion to reconsider and for clarification of the trial court's ruling on the motion to suppress, arguing that the ruling that Mr. Clay did not knowingly and intelligently waive his *Miranda* rights was against the weight of the evidence, and that Mr. Clay did not clearly and unequivocally invoke his right to silence or his right to counsel.

¶ 40    The trial court went back over the evidence in detail. In its ruling on the motion to reconsider, the court found that when the detective told Mr. Clay, "[y]ou don't have that option," he was telling Mr. Clay that "he does not have the option to have an attorney at that time." The court also found that Mr. Clay's request for a lawyer "used language that it is reasonable that an officer might perceive as being somewhat conditional." Accordingly, the court found no clear and unambiguous assertion of the right to counsel. With respect to the right to counsel the court also said:

"I do find that specifically this exchange between Mr. Clay and the Chicago police detective with respect to that attempted assertion of a right to counsel, that goes to—that together with the other facts which the Court will detail in short order, very much goes to the issue of his will being overborne and that limited issue of voluntariness as raised by the defense."

¶ 41    The court did find that Mr. Clay unambiguously invoked his right to remain silent:

"[I]n the record there is a clear and unambiguous request to remain silent, and this happened back on January 5, 2012. I believe it started at the time 13:59, he makes another assertion at 14:01, and then a third one at 14:11. And it's only after the third assertion, which is 'I don't want to talk anymore. I don't even want to talk anymore. I don't want to talk

anymore,' it was after that third time and only then that the police honored his request to remain silent.

As the parties well know, those are two separate parts of the *Miranda* warnings. You can request counsel, you can assert your right to remain silent, you can do both. But in any event, whenever one or the other or both is asserted, the police are required to scrupulously honor the request, and that was not done in this case beginning on January 5, 2012."

¶ 42    The court then again explained why it found that Mr. Clay did not knowingly and intelligently waive his right to remain silent. The court reiterated that Mr. Clay's "will was overborne under the totality of the circumstances." The court noted that Mr. Clay was arrested between 4 and 5 a.m., that he was locked in an interrogation room for a "significant period," and that when he was given his *Miranda* warnings, he was directed by a detective that "after I give you your rights, you have to say yes."

¶ 43    The court then carefully recounted the testimony of both experts, during which it explained:

"I think some of the most telling information that Dr. Frumkin provided, at least that persuaded the Court, has to do with what the interpretation of [Mr. Clay]'s performance on the test actually mean. ***

As examples, he talked about when [Mr. Clay] repeatedly makes statements about requesting counsel, continues to talk when he's told the police he does not want to talk anymore, yet he continues to talk, that Tyrone Clay lacks the intellectual ability to assert himself to explain or to gain the cooperation of the police and not continuing to talk to him. He does not put together the concepts that he can choose not to talk to the police until he speaks to an attorney.

* * *

And in particular, when Dr. Henry opined that one's intelligence or IQ is not relevant to *Miranda*, understanding or appreciation, Dr. Frumkin vehemently disagreed with that and stated that it goes against every research study ever done about people with low intelligence and how people with low intelligence *** as a measure of IQ understand and appreciate *Miranda*.

Dr. Frumkin acknowledged that there is no one IQ score or mental illness that would automatically make someone competent or incompetent to waive and understand *Miranda*, but when you look at the person's individual characteristics together with the IQ, that that is what is telling.

So, again, without going into more exhaustive detail, I really just seek to give some examples of demonstrating how I arrived at my ultimate conclusions, but I did find on the whole the testimony with respect to Dr. Frumkin's analysis and the basis therefore demonstrated to the Court that [Mr. Clay] did not knowingly and intelligently waive his rights, even given the entirety or the totality of the circumstances. He's not an educated person. He did attend school at least up to the 9th Grade, he was 29, he had several arrests, but, again, given the particular circumstances of this interrogation proceeding, from the way it began, the administering of the rights together with [Mr. Clay]'s assertions or attempt to exercise one or the other and those gone unheeded, and he never did actually assert the right to counsel, but he did clearly assert his right to remain silent and despite that he continued being questioned. That together with his suggestibility as defined by Dr. Frumkin operated to make this a not knowing and intelligent waiver of his right, his will was overborne, and therefore, the motion to suppress statements will remain and the State's

15

motion to reconsider is denied."

¶ 44                                    II. JURISDICTION

¶ 45    The trial court denied the State's motion to reconsider on April 9, 2019, and on April 18,

2019, the State timely filed its certificate of substantial impairment and its notice of appeal. We

have jurisdiction pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. July 1, 2017) and Rule

606 (eff. July 1, 2017), governing interlocutory appeals by the State in criminal cases.

¶ 46                                    III. ANALYSIS

¶ 47    The legal principles underlying this appeal are well settled. Mr. Clay was constitutionally

entitled to the assistance of counsel and to remain silent during what the parties agree was an in-

custody interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Any statements the police

obtained that failed to honor those rights would be inadmissible in his trial unless Mr. Clay

voluntarily, knowingly, and intelligently waived those rights. *Id.* at 479; *People v. Bernasco*, 138

Ill. 2d 349, 367-68 (1990).

¶ 48    As our supreme court has explained:

"[F]or a defendant's confession to be admitted at trial, the State must first prove the

defendant knowingly and intelligently waived his privilege against self-incrimination and

his right to counsel. To establish a valid waiver, the State cannot simply rely on proof that

the defendant received the *Miranda* warnings or gave a confession. In determining whether

a defendant knowingly and intelligently waived his *Miranda* rights, a court must consider

the totality of the circumstances, including the characteristics of the defendant and the

details of the interrogation, without any one circumstance or factor controlling." *People v.

Reid*, 136 Ill. 2d 27, 54 (1990).

¶ 49    Whether a defendant has waived *Miranda* rights knowingly and intelligently is determined

"by the particulars facts and circumstances of the case, including background, experience and conduct" of the defendant. *People v. Braggs*, 209 Ill. 2d 492, 515 (2003), *as modified on denial of reh'g* (Apr. 15, 2004). Evidence of a defendant's limited mental or intellectual capacity at the time of a confession alone does not establish that he or she was incapable of waiving *Miranda* rights, but "limited intellectual capacity is one of several factors to be considered in this regard." *Id.* at 514.

¶ 50    Our supreme court has also explained the necessary elements of a valid waiver:

> "To be valid, the waiver must reflect an intentional relinquishment or abandonment of a known right or privilege. The accused must possess a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail. The mental state that is necessary to validly waive *Miranda* rights involves being cognizant at all times of the State's intention to use one's statements to secure a conviction and of the fact that one can stand mute and request a lawyer." *In re W.C.*, 167 Ill. 2d 307, 327-28 (1995).

¶ 51    In assessing whether there has been a knowing and intelligent waiver, part of our consideration is how interrogators have interacted with defendants with cognitive impairments:

> "[I]t is generally recognized that the mentally retarded are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights." *Braggs,* 209 Ill.2d at 514.

As we noted in *In re S.W.N.*, 2016 IL App (3d) 160080, ¶¶ 72-73, this means that interrogators

must take "special care" in giving *Miranda* warnings to and obtaining confessions from persons with limited intellectual ability. As we explained in *People v. Daniels*, 391 Ill. App. 3d 750, 781 (2009), "[t]he crucial test to be used in determining whether an accused knowingly and intelligently waived her rights is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of her rights."

¶ 52    We afford "great deference" to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Braggs*, 209 Ill. 2d at 505. In addition, the trier of fact determines the credibility and weight to be given to expert testimony and is not obligated to accept the opinions of one expert over another. *People v. Urdiales*, 225 Ill. 2d 354, 431 (2007).

¶ 53    The State makes two arguments in asking us to reverse the trial court in this case: first, that the trial court's findings were against the manifest weight of the evidence, and second, that the trial court erred as a matter of law in finding that there was a distinction between a knowing waiver and an intelligent one. We deal with these two arguments in turn.

¶ 54    Mr. Clay addresses these arguments and also suggests that we can affirm the trial court's suppression order on two alternative bases: the confession was involuntary and Mr. Clay also invoked and did not waive his right to counsel. We reject the State's arguments for reversing the trial court's order suppressing this confession and find it unnecessary to reach Mr. Clay's alternative bases for affirming that order.

¶ 55    A. The Trial Court's Findings Were Not Against the Manifest Weight of the Evidence

¶ 56    The State contends that the totality of the circumstances demonstrated Mr. Clay's confession was knowing and intelligent and that the trial court relied too much on IQ tests

18

performed by Dr. Frumkin, which should have been discounted because, as Dr. Frumkin acknowledged, Mr. Clay malingered on some of those tests. The State also argues that it was "incongruous" for the trial court to find that Mr. Clay did not knowingly and intelligently waive his *Miranda* rights, while finding that he was intelligent enough to invoke his right to silence and his right to counsel during questioning.

¶ 57    While we agree with the State that the trial court was required to consider the totality of the circumstances, the trial judge clearly did that and the State has simply failed to make a showing that the trial court's finding was against the manifest weight of the evidence. The trial court heard and carefully considered all of the evidence presented.

¶ 58    The court's determination that Dr. Frumkin was more convincing and more credible than Dr. Henry must be deferred to. "In resolving contradictions the trier of fact may accept one expert's opinion over another, and the weight to be given to an expert's opinion is measured, in part, by the factual details supporting his conclusions." *People v. Wright,* 161 Ill. App. 3d 967, 980 (1987). The trial court explained that she found Dr. Frumkin's conclusions more convincing because Dr. Frumkin's testing went specifically to a person's ability to understand *Miranda*, Dr. Frumkin explained what Mr. Clay's performance on each test meant with respect to his understanding of *Miranda*, Dr. Frumkin convincingly dispelled the bases for Dr. Henry's opinions, and the trial court found that Dr. Frumkin's explanation that a person can know his *Miranda* rights without understanding how to exercise them was, in this case, "borne out by the evidence," "based on [Mr. Clay's] continual statements about counsel, his assertions to remain silent, those that went unheeded by police."

¶ 59    The State's arguments that the trial court should have given greater weight to Mr. Clay's age, that he had some level of high school education, that he said during the ERI that he understood

his *Miranda* rights, are requests that we reweigh the evidence, which we are not permitted to do. The trial court's careful analysis, both in her initial ruling and on the motion to reconsider, make clear that she considered all of these factors and all of the evidence and determined that Mr. Clay's waiver was not knowing and intelligent.

¶ 60     The State claims that the trial court relied too heavily on IQ tests without considering that Dr. Frumkin acknowledged that Mr. Clay may have been malingering on some of those tests. However, the court did not rely solely on the IQ tests but also on tests that were designed specifically to measure Mr. Clay's susceptibility and his understanding of *Miranda*. While the State is correct that Dr. Frumkin acknowledged that that he believed that Mr. Clay may have been malingering the first day of testing and Mr. Clay admitted to him that he had been advised by other people in custody to "dumb things down" in his answers, Dr. Frumkin specifically took this into account, readministered some of the tests, and was comfortable that on the June tests Mr. Clay was using his "best efforts."

¶ 61     The State points to the fact that in *Braggs*, the defendant had far more significant cognitive impairments since he been found unfit to stand trial, needed a guardian, and had an IQ of 54. However, the import of *Braggs* is not that it is factually similar; rather, as we summarized in *S.W.N.*, our supreme court recognized the need to consider a defendant's cognitive functioning:

> "The *Braggs* court's use of the term 'mentally retarded' was referring generally to persons below a range of 'normal intellectual ability.' [Citation.] In other words, the court gave no indication that, for example, a defendant with an IQ of 69 would require special care while a defendant with an IQ of 71 would not require such care. Thus, while a medical diagnosis of intellectual disability or mental retardation is relevant, it is not strictly necessary to a determination that a defendant's mental makeup warranted special care." *S.W.N.*, 2016 IL

App (3d) 160080, ¶ 73 (quoting *Braggs*, 209 Ill. 2d at 514).

¶ 62    The State relies heavily on our decision in *People v. Goins*, 2013 IL App (1st) 113201, where we found a defendant with an IQ similar to Mr. Clay's was able to knowingly and intelligently waive his *Miranda* rights. However, in *Goins*, the *trial court* had found that the defendant had knowingly and intelligently waived his rights. We relied heavily on the fact that "we give deference to the trial court as the finder of fact and will not substitute our judgment for that of the trial court regarding the weight to be given the evidence or the inferences to be drawn therefrom," and that the weight and credibility of competing expert testimony was a question for the trial court. *Id.* ¶ 57.

¶ 63    Moreover, as the State emphasizes, whether a waiver is knowing and intelligent depends on the totality of the circumstances. *Reid*, 136 Ill. 2d at 54. These circumstances include not only the defendant's level of comprehension but also the questioning itself. *Daniels*, 391 Ill. App. 3d at 781. How was the defendant administered his rights and how did the police or prosecutors respond to the defendant's efforts to assert those rights? In *Goins*, both the police and the assistant state's attorney read the defendant his rights one by one, stopping to make sure he understood each right before continuing, and there is no indication in our opinion in *Goins* that the defendant attempted to assert his right to stop the questioning or to have counsel present. *Goins*, 2013 IL App (1st) 113201, ¶¶ 26-27.

¶ 64    In that respect, this case is more similar to *S.W.N.* and *Daniels* than it is to *Goins.* In *Daniels*, the defendant had been given tests like those given to Mr. Clay, also administered by Dr. Frumkin. 391 Ill. App. 3d at 767-71. And, according to Dr. Frumkin, the defendant in *Daniels* had an IQ of 55. *Id.* at 769. We summarized the techniques used in that case as follows: "reciting the *Miranda* warnings to defendant, without defining them in simpler terms, and asking defendant if

she understands each right. Again, defendant merely responds with 'yes' to each question." *Id.* at 791. The questioning was exemplified by this kind of exchange:

" 'ASA Levine: You told me before that you are giving this statement because you want to cooperate? You want to get this off your chest?

Defendant: Yes.' " *Id.* at 792.

We reversed the trial court's finding that the waiver was knowing and voluntary in that case, concluding:

"[T]he trial judge apparently chose to formulate his opinion based upon his own conceptualization of what it would take to establish sufficient comprehension of the import of *Miranda* warnings and chose to rely on defendant's videotaped statement and her answers of 'yes' to questions regarding her understanding of *Miranda* warnings without probing into defendant's ability to understand the questions to which her answers were directed." *Id.*

¶ 65    Similarly, in *S.W.N.*, 2016 IL App (3d) 160080, we reversed the trial court's refusal to suppress the defendant's incriminatory statement, concluding:

"The totality of the circumstances indicate that respondent did not understand his *Miranda* rights, nor did he comprehend what their waiver would entail. No special care was taken to ensure that respondent, an intellectually impaired juvenile, understood the nature of the rights or the consequences of waiving them. Accordingly, respondent could not have knowingly and intelligently waived those rights, and the incriminating statements he made while in custodial interrogation are inadmissible." *Id.* ¶ 86.

¶ 66    This case raises the concerns we recognized in *Daniels* and *S.W.N.* As the trial court specifically noted in this case, when the police gave Mr. Clay his *Miranda* rights, rather than asking

him if he understood them or had any questions, the detective told him, "after I give you your rights, you have to say yes." The trial court noted this fact and also relied on the fact that the detectives disregarded several of Mr. Clay's attempts to invoke his right to stop talking and his ambiguous attempts to invoke his right to counsel. At one point, the detectives told Mr. Clay that he did not have the "option" of getting a lawyer. As the trial court said at the end of her ruling on the motion to reconsider, "given the particular circumstances of this interrogation proceeding, from the way it began, the administering of rights," the fact that Mr. Clay's attempts to assert his right to remain silent went unheeded and his "suggestibility as defined by Dr. Frumkin operated to make this not a knowing and intelligent waiver."

¶ 67     In its reply brief, the State argues that this case is similar to *People v. Walker*, 2012 IL App (1st) 083655, where we distinguished *Daniels*. However, the defendant in *Walker* "scored an overall IQ of 80, read at a fifth-grade level, and was responsive and coherent during his interviews." *Id.* ¶ 43. Thus, the tests administered suggest a higher level of functioning than Mr. Clay's tests did. More importantly, as we stressed in that case and we stress here, the trial court is in the best position to weigh the testimony—particularly the expert testimony—and to consider the multitude of factors. As we concluded in *Walker*, "[t]he trial court also viewed [the defendant's] videotaped statement twice and found that the statement was voluntarily, knowingly, and intelligently made." *Id.* ¶ 42. That conclusion must be accepted unless it is against the manifest weight of the evidence. *Id.* ¶ 46.

¶ 68     The State also contends that it is "incongruous" for the trial court to have found that Mr. Clay invoked his right to remain silent while also finding that he lacked the ability to knowingly and intelligently waive that right. However, the import of the court's findings as to Mr. Clay's invocation of his rights was that they were unsuccessful. The trial court noted it relied on Dr.

Frumkin's conclusion that Mr. Clay "continues to talk when he's told the police he does not want to talk anymore, *** lacks the intellectual ability to assert himself to explain or to gain the cooperation of the police ***. He does not put together the concepts that he can choose not to talk to the police until he speaks to an attorney." Thus, it was these attempts and the fact that Mr. Clay could not effectuate them that helped support the trial court's conclusion that Mr. Clay did not knowingly and intelligently waive his *Miranda* rights.

¶ 69    In short, the State has not convinced us that the trial court's carefully made findings are against the manifest weight of the evidence. The trial court meticulously considered all of the evidence presented at the hearing, addressing the strong and weak aspects of both sides' positions. Under these circumstances, we cannot find the trial court's ruling was factually erroneous.

¶ 70                    B. The Trial Court Did Not Make an Error of Law

¶ 71    The State alternatively argues that the court's ruling "was an error as a matter of law." According to the State, the trial court ruled that "despite the fact that [Mr. Clay] made statements that demonstrated a clear understanding of *Miranda*, he did not 'appreciate the significance of the rights based on [his] misunderstanding of how the legal system works.' " The State argues that "knowing" and "intelligent" can be used interchangeably and the trial court improperly separated the concepts of knowing and intelligent and wrongly suppressed the confession by finding Mr. Clay's waiver of his *Miranda* rights was knowing but not intelligent. But, contrary to the State's argument, the trial court's decision was in fact well-supported legally and factually.

¶ 72    The State's argument rests in part on a mischaracterization of both the trial court's ruling and Dr. Frumkin's testimony. The portion of the ruling that the State cites was where the court quoted Dr. Frumkin's four points of disagreement with Dr. Henry, including Dr. Henry's beliefs that IQ was not relevant, that mental illness was significant, and that exposure to *Miranda* had "a

lot to do with how well a person understands *Miranda*." The fourth point of disagreement was that Dr. Henry did not see a difference between a knowing waiver and an intelligent waiver, while Dr. Frumkin believed a waiver could be knowing in the sense that a defendant could recite his *Miranda* rights, but not intelligent in terms of understanding what those rights meant. Dr. Frumkin never expressly found that Mr. Clay's waiver of rights was "knowing," although he did rest his conclusions on his belief that Mr. Clay lacked an understanding of what his rights meant and how he could exercise them effectively.

¶ 73    The trial court also never found that Mr. Clay's waiver was knowing but not intelligent. Rather, she concluded, "on the whole the testimony with respect to Dr. Frumkin's analysis and the basis therefore demonstrated to the court that [Mr. Clay] did not knowingly and intelligently waive his rights." She found that Mr. Clay "can believe that he understands the warnings but he lacks the ability to put together the concepts that are required to stop the police questioning despite his efforts."

¶ 74    The trial court's analysis is grounded in well-settled law. As our supreme court made clear long ago, a knowing and intelligent waiver means that a defendant understands the "State's intention to use one's statements to secure a conviction and of the fact that one can stand mute and request a lawyer." *In re W.C.*, 167 Ill. 2d at 327-28. The trial court found here that Mr. Clay could recite the words of the *Miranda* warnings but could not use them to stop the questioning and stand mute. Thus, regardless of whether "knowing" and "intelligent" are separable or inextricable requirements of a waiver, the trial court's ruling is well-supported by established legal principles.

¶ 75    Because we are affirming the trial court's ruling based on our conclusion that it did not err in finding that Mr. Clay did not knowingly and intelligently waive his *Miranda* rights, we need not reach Mr. Clay's alternative arguments for affirming the trial court's order.

25

¶ 76                                    VI. CONCLUSION

¶ 77    For the foregoing reasons, we affirm the order entered by the trial court and remand this case for trial.

¶ 78    Order Affirmed; Case Remanded.