2022 IL App (2d) 210561-U
No. 2-21-0561
Order filed September 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 19-CF-500 |
| BENJAMIN M. SAVINO, | ) ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in granting defendant's motion to suppress statements he made to detectives. Defendant was in custody when he made the statements, and the circumstances surrounding defendant's waiver of his *Miranda* rights demonstrated that the waiver was not knowing and intelligent. Affirmed.

¶ 2    The State charged defendant, Benjamin M. Savino, with two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2018)). Defendant moved to suppress statements that he made to detectives on the basis that he did not validly waive his *Miranda* rights. The trial court granted defendant's motion. The State appeals. For the reasons set forth below, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Defendant was born on October 17, 2000. The indictment alleged that, between October 18, 2018, and March 16, 2019, he committed aggravated criminal sexual abuse against his niece, who was under 18 years old at the time, in that (1) he placed her hand on his penis and (2) he placed his hand on her vagina.

¶ 5                                    A. Motion to Suppress

¶ 6    Defendant filed a motion to suppress statements that he made to McHenry County sheriff's detectives. Defendant argued that he did not validly waive his *Miranda* rights and that his statements were otherwise involuntary given his age, inexperience with law enforcement, family circumstances, and the detectives' downplaying of the *Miranda* warnings and failure to confirm that defendant understood his rights. The State filed a response in which it argued that *Miranda* warnings were unnecessary in the first instance because defendant was not in custody when the statements were made.

¶ 7    At the hearing on the motion to suppress, the State first called McHenry County Sheriff's Deputy Eric Woods. Woods testified on direct examination as follows. On April 15, 2019, he was dispatched to defendant's home; the nature of the dispatch was a "report for possible sex crimes." Defendant's father, Greg Savino, and other family members were there. Woods spoke to defendant alone. Woods asked defendant what he wanted to speak about, and defendant "began telling [Woods] how there was some incidents that started occurring approximately five years earlier from the date that I was out there involving three of his nieces." Defendant "started out by saying that one of the initial incidents involved one of his nieces where he had been touching her belly, her bare-skinned belly, and then proceeded to tell me that there were approximately 20 to 25 other incidents that had occurred where—involving his other two nieces that became more descriptive." After defendant described some of the incidents, Woods "asked a couple questions just to clarify

what he was saying, and that—that was it." Woods never promised defendant anything or threatened him with anything. He never made a show of force. To Woods's knowledge, the sheriff's office had not been investigating defendant before April 15, 2019.

¶ 8    Woods testified that he then contacted McHenry County Sheriff's Detective Mike Quick and "advised him of the statements that were made to me." Quick asked Woods whether defendant was willing to come to the sheriff's office and make a voluntary statement. Woods spoke to defendant, who said that he would do so. Greg drove defendant to the sheriff's office, and Woods followed. Woods parked next to Greg's car. Defendant and Woods entered the building and walked to the main investigations lobby, where Woods introduced defendant to Quick. Woods then went back outside and spoke with Greg.

¶ 9    Woods testified on cross-examination as follows. When he drove to defendant's house, he knew only that someone there wanted to talk to him and confess to some sort of sexual crimes. Woods learned the information from Lieutenant Ken Neilsen; someone from defendant's family had called Neilsen because the family knew Neilsen. Woods spoke to defendant at defendant's house for less than an hour. At that point, Woods contacted his investigation supervisor and "advised him of what I had because I know that we had detectives that specialized in these types of crimes." Woods was put in touch with Quick, and Quick asked whether defendant was willing to go to the sheriff's office and provide a voluntary statement. Defendant agreed, and Greg offered to drive defendant there. When Woods parked at the sheriff's office and got out of his vehicle, he did not tell Greg to stay in the parking lot while Woods took defendant inside. After entering the building, introducing defendant to Quick, and exiting the building, Woods advised Greg that he was free to go or "hang out *** and wait for his son."

¶ 10    Woods testified that, when he asked defendant about making a voluntary statement, he did not tell him how the statement would be used or whether it would be recorded. Woods knew the office had recording equipment. Woods did not tell defendant how long he would be at the sheriff's office, as he did not know. He was not aware that defendant would be placed in a locked interview room.

¶ 11    On redirect examination, Woods testified that defendant appeared not to want to talk to Woods in the presence of his parents. Defendant never attempted to break off the conversation or tell Woods that he did not want to speak to him.

¶ 12    Quick testified on direct examination as follows. On April 15, 2019, Woods called him and described in general terms what defendant had told him. At the sheriff's office, Quick and McHenry County Sheriff's Detective Chris Marvel escorted defendant, who was not in handcuffs, to the interview room. Before they placed him into the room, they started the recording equipment. Quick told defendant that they were "just there to talk to him in reference to the information he had." Because the building was locked, Quick was concerned that the issue of whether defendant was in custody might later arise. Therefore, he told defendant that he needed to read him his *Miranda* rights. Quick read the juvenile *Miranda* warnings from a card. He asked defendant whether he was still willing to speak with him and Marvel, and defendant said yes.

¶ 13    Quick testified that defendant never requested an attorney. He never asked to leave the room and was never physically detained, such as by being shackled. Defendant's demeanor during the interview was cooperative and apologetic. Quick and Marvel never prevented defendant from leaving the room or the building. They never threatened him or promised him anything. Defendant never refused to answer any of their questions. After the interview, the detectives did not arrest defendant but allowed him to return to Greg.

¶ 14    Quick identified a copy of the audio and video recording of the interview. The copy was admitted into evidence. The video was played. We summarize its contents as pertinent here.

¶ 15    At 9:26 p.m., the detectives lead defendant into the interview room, which is small, windowless, and sparsely furnished. The detectives then depart. For approximately nine minutes, defendant is alone. At 9:35 p.m., the detectives return. Quick tells defendant that he is from the sheriff's department and that "all we do here is talk to people in here, Okay?" He tells defendant that if he has any questions, he may ask the detectives. He ascertains that defendant does not want to use the restroom or want any water and is not hungry. Quick repeats, "We just talk to people here." He asks defendant for basic information. In the course of answering Quick, defendant states that he got his first cell phone a year ago.

¶ 16    At 9:38 p.m., Quick notes that Greg is outside and tells defendant, "We'll let you go back with your dad when we're done." Quick then tells defendant, "Since you're in here, we have locked doors, as you saw when we came in. So I have to read you [*Miranda* warnings], that's because you're in a locked facility.  Technically, you just can't walk all the way out of here." He adds that, because of the locked doors "and things like that *** technically somebody may consider you in custody." After defendant says, "Okay," Quick adds, "So, my boss is making—anybody that comes in here to talk to, I have to read them this *Miranda* warning, Okay? And particular for you, I will read you the juvenile version of it, since you're—you probably just turned 18 last year, right?" Once defendant confirmed he was 18, Quick repeated that he was reading defendant the *Miranda* warnings "because there's locked doors and things like that, and technically someone may consider you in custody." Quick then tells defendant that he is "not in any trouble" and that the detectives "just want to talk to [him]." Quick then reads defendant the juvenile *Miranda* warnings:

"You have the right to remain silent. That means you do not have to say anything. Anything you do say can be used against you in court. You have the right to get help from a lawyer. If you cannot pay for a lawyer, the court will get you one for free. You can ask for a lawyer at any time. You have the right to stop this interview at any time."

¶ 17    Quick next says, "Because I read you that, I have to ask you these two things, Okay? Quick then asks defendant whether he wants a lawyer; defendant responds, "No, sir." Quick then asks defendant whether he wants to talk to Quick; defendant responds, "Yes." Quick then reiterates that the *Miranda* warnings are "just a formality, our bosses make us read [them] to you. Like I told you, you're not in trouble with Chris or I. We just want to talk to you about information you have, Okay?" Quick never asks defendant whether he understands the rights that he has been read.

¶ 18    At 9:40 p.m., Quick asks more preliminary questions. Defendant states that he is home schooled and will graduate in a few months. He hopes for a career as a musician and plays four instruments. He has had several jobs, including working on cars in Woodstock and seasonal work in orchards. Since age 10 or 11, he has helped out at farmers' markets, which involves regular customer service.

¶ 19    The interview then turns to the possible criminal conduct at issue. At 9:47 p.m., Quick asks defendant to tell them "what happened tonight." Defendant explains that Woods came to his house and asked him questions about "the whole situation." Quicks responds that "Chris and I have no idea what the 'whole situation' is." Defendant responds that the situation is regarding "sexual stuff." Quick says, "We just want to know what's going on with this whole thing and know where we're at, what kind of services we can offer people and things like that. Okay?" He asks defendant to recount the pertinent conduct and tell them what is on his mind. Defendant does so. At one point during the questioning, Quick told defendant to "take your time, it's okay, we're just talking just

three guys, right. Take your time." At a subsequent point, as defendant continued to recount the conduct, Quick told defendant to "take your time. Relax. Like I said, it's just the three of us chatting." During the course of the interview, defendant admitted to various instances of criminal and aggravated criminal sexual abuse with his three nieces, starting as a juvenile, but continuing for several months after he turned 18.

¶ 20    At 9:52 p.m., Quick asks defendant why he chose to speak that day. He explains that after a conversation with his family about his conduct, his family spoke with their pastor. The pastor suggested that defendant "come to you guys and tell you guys and seek counseling." Quick followed up by asking defendant about his pastor and church. Defendant indicated he had been a member of the Clinton Bible Church in Clinton, Wisconsin since he was 9 years old.

¶ 21    At 10:29 p.m., the detectives leave the room. Five minutes later, they return. Defendant asked, "where it goes from here." Quick provided the following explanation, "Well, Chris and my goal and our job is to make sure that we provide everyone with the services that are needed. Okay? Obviously this deals with a complex family issue that's going on ***." Quick elaborated that "we need to make sure that everyone gets talked to just like you were ***. And that's just so, we need, you know, it's like your pastor saying you should get some counseling services[.]" Quick then went on to explain how the Sheriff's Department, State's Attorney, DCFS and the child advocacy center work to together on these cases to support everyone. Quick noted that, while most of the conduct defendant told them about occurred while he was a juvenile, some of it occurred after defendant turned 18. Quick shortly thereafter indicated, "our goal isn't to you know mess up your life, or anything like that, that's not our goal, okay, our goal is to be in the best interests of everybody, and make sure you get the support services you need. All right?" When asked if he had any other questions, defendant asked if he was going to jail. Quick said, "you're not going to jail

*** you facing any criminal charges *** that's not up to Chris or I *** we're here to get you support and what you need[.]" In conclusion, Quick suggested that any criminal charges would depend upon what they learned when they spoke to defendant's nieces and discussed the case with the State's Attorney's Office. At 10:44 p.m., defendant was told he would be taken back to his father, and everyone left the interview room.

¶ 22     After the video was played, Quick provided testimony on cross-examination. In their initial conversation, Woods told Quick that the case involved "inappropriate touching," which, Quick testified, could correlate to potential sex offenses. Quick was not sure whether they were investigating a crime, but he conceded that they were investigating a potential crime. When the detectives brought defendant into the interview room, the door was not locked, but the detectives did not tell that to defendant. Quick did not recall whether he ever asked defendant if he wanted Greg in the room with him. Quick did not tell defendant that the questioning would be videotaped. As far as he knew, defendant was not aware that it was. However, a sign on the wall said that the room was "audio- and video-recorded."

¶ 23     Quick testified that he used the juvenile *Miranda* warnings because they were easier to understand and because defendant would be asked about acts he performed when he was under eighteen. Asked whether he ever "did anything to determine whether or not [defendant] understood what the consequence of *** waiving his rights would be," Quick testified, "I didn't." Although written *Miranda* waiver forms were available, he did not use one.

¶ 24     Asked whether he had been aware that defendant had grown up in a religious household, Quick testified that he figured that out from "the conversation about his family talking with the pastor," including that the pastor told defendant to go to the police and get counseling.

¶ 25     The State rested. Defendant put on no evidence.

¶ 26                                B. Trial Court's Ruling

¶ 27     The trial court granted defendant's motion to suppress the statements. In its oral findings, the trial court initially noted that the State's sole argument in its written response to the motion to suppress was that defendant was not in custody when he was questioned. Whether defendant was in custody was a question of fact, requiring the consideration of various factors but ultimately coming down to the totality of the circumstances.

¶ 28     The court recounted the events of April 15, 2019, as follows. Defendant had initiated the investigation by voluntarily reporting himself, and his encounter with Woods was noncustodial. However, after driving defendant to the sheriff's office, Greg was not allowed into any part of the facility. The interview room was small and windowless. Although it was not locked, the detectives never told this to defendant, and Quick stated to defendant that he might not have been able to exit the building anyway. Once inside the interview room, defendant was not told that he was free to leave it. Defendant was seated in a corner, and Quick sat between defendant and the door. He was in plainclothes but armed with his gun and other police equipment. Defendant was left alone in the room for 10 minutes before the detectives returned. The mood of the interview was not coercive; indeed, Quick was "friendly and nonconfrontational." The court continued:

        "The mental makeup of [defendant] was that he was there *** to confess his sins. He had been directed to contact the police by his pastor. The evidence establishes that [defendant] had been a member of his congregation for some period of time, and the reasonable inference is that he took comfort and solace from direction provided by his pastor.

        The Court's conclusion from that backstory regarding his religious affiliation, his longevity with his congregation and pastor and the fact that he contacted the police to

confess his sins or transgressions is that he was in a vulnerable state when he was at the sheriff's office.

Under the totality of the circumstances, a reasonable person would have considered himself to be in custody and not free to leave[.]"

¶ 29 The court added that, in reading the *Miranda* form, Quick referred to "the fact that some people might consider the environment as custodial." Neither detective told defendant that he was free to leave. Moreover "[t]he detectives were clearly seeking incriminating information."

¶ 30 The court next addressed whether defendant knowingly and voluntarily waived his rights. Defendant was properly advised of his rights; using the juvenile *Miranda* warnings was wholly proper. The interview was conducted without coercive tactics. Further, "[w]hile Detective Quick may have minimized the involvement of the sheriff's office and, as argued by [defendant], couched the interview in terms of just three guys talking, he did not do so impermissibly." Thus, "[t]he real issue in this case ultimately turn[ed] on whether [defendant] knowingly waived his *Miranda* rights."

¶ 31 The court noted that, under governing case law, a knowing waiver requires that the defendant have a basic understanding of what his rights encompass and a minimal understanding of what waiving his rights would entail. There was no explicit authority that the defendant must be asked whether he understands each right, the court had not found "any Illinois appellate authority that holds that there is an intelligent waiver without an acknowledgement by the defendant that he understands his rights." "To the contrary," the "common thread" of the cases was that this acknowledgment is necessary because understanding is a prerequisite to a knowing waiver.

¶ 32    Here, the court continued, Quick never asked defendant whether he understood his rights. The warnings told defendant that anything that he provided could be used against him in court. However, defendant was speaking to the police on the advice of his pastor, "confessing effectively his sins." Had he perceived the interview "as tantamount to confession," he might well have believed that what he said would not be used against him in criminal prosecution. The State had to prove an intentional relinquishment of constitutional rights. "Without an indication that the defendant was asked if he understood his rights, a critical step in the analytical flow is missing." Accordingly, the trial court granted defendant's motion to suppress.

¶ 33                              C. State's Motion to Reconsider

¶ 34    The State moved to reconsider, arguing first that the trial court erred in holding that defendant had been in custody. The State contended that the court mistakenly found that Greg was denied access to the sheriff's building. Further, although the court found that the detectives never told defendant that he was free to leave, Quick told him that they would let him go back with Greg when they were done and that he had the right to stop the interview at any time. Finally, although the court relied on defendant's religious beliefs and the vulnerability that his need to confess created, there was no evidence that the detectives exploited this frame of mind; thus, it did not support a finding that he had been in custody. Indeed, a reasonable person would not view a religious confession as a police-dominated interaction that he could not end.

¶ 35    Second, the State argued that the trial court erred in finding that defendant did not validly waive his rights. In emphasizing the detectives' failure to ask defendant whether he understood his rights, the court had relied on case law predating the current statute governing juvenile *Miranda* warnings. Moreover, while there was no Illinois case law deciding squarely whether the extra inquiry is necessary, cases from other jurisdictions have held either that a suspect need not be

asked directly whether he understands his rights or that an explicit statement of waiver is not necessary to find a valid waiver. Under all of the circumstances, including defendant's age, intelligence, education, and social experience in his numerous jobs and activities, defendant understood the rights that he was waiving.

¶ 36    Following argument, the trial court denied the State's motion to reconsider. In maintaining that defendant had been in custody during the interview, the trial court noted that Quick had implied to defendant that the situation was custodial. In addition, the trial court stated that it would not change its finding regarding the invalidity of the waiver. The trial court stated that it had not meant to state categorically that not asking a suspect whether he understands his rights "end[s] the analysis fatally to the State." However, under all the circumstances here, absent the inquiry, the court could not find that defendant knowingly waived his rights. Thus, the trial court denied the motion to reconsider.

¶ 37    This timely appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, the State contends that the trial court erred in suppressing defendant's statements to Quick and Marvel, as (1) defendant was not in custody when he made the statements and thus no *Miranda* warnings were required, and (2) even if defendant had been in custody, the warnings were sufficient to establish a knowing and voluntary waiver.

¶ 40    In reviewing a trial court's ruling on a motion to suppress, we accept the court's factual findings unless they are against the manifest weight of the evidence, but we consider *de novo* the ultimate issue of whether the statement should be suppressed. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion

is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence. *People v. Banks*, 2020 IL App (2d) 180509, ¶ 25.

¶ 41     When a defendant moves to suppress a confession, the State bears the burden of proving by a preponderance of the evidence that the confession was voluntary. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). "The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *Id.*

¶ 42     Here, defendant moved to suppress his statement on the basis that he did not receive proper *Miranda* warnings and that any waiver was not voluntary. Per *Miranda*, a person must be informed before interrogation starts that (1) he has a right to remain silent, (2) any statement made may be used against him, and (3) he has the right to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Slater*, 228 Ill. 2d at 149. *Miranda* warnings, however, are required only if a person has been " 'taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Slater,* 221 Ill. 2d at 149 (quoting *Miranda*, 384 U.S. at 444). The State contends that the trial court erred both in finding that defendant was in custody when he made his admissions at the sheriff's department and that, even if he was in custody, he knowingly and voluntarily waived his *Miranda* rights. We address each argument in turn.

¶ 43                              A. Custody

¶ 44   Whether a person is in custody for *Miranda* purposes turns on inquiries into (1) the circumstances surrounding the interrogation and then (2) whether, given those circumstances, "a reasonable person, innocent of any crime," would have felt not at liberty to terminate the interrogation and leave. *Braggs*, 209 Ill. 2d at 505-06. Relevant circumstances include the location, time, length, mood, and mode of the interrogation; the number of police officers present;

the presence or absence of the family and friends of the accused; any indicia of formal arrest; and the age, intelligence, and mental makeup of the person being questioned. *Id.* at 506. When an officer is aware of a person's traits that make him particularly vulnerable to the impression that he is in custody, and the officer exploits those characteristics in questioning, that is also relevant to the custody determination. *Id.* at 507.

¶ 45    Initially, in contending that the trial court erred in finding that defendant had been in custody, the State argues in part that the court made two factual findings that were against the manifest weight of the evidence. We consider these in turn.

¶ 46    First, the State contends that the court mistakenly found that Greg had been barred from the interview. In denying the State's motion to reconsider, the trial court acknowledged that there was no "definitive expression in [Quick's] testimony that [Greg] was absolutely prohibited from accompanying his son into the interrogation." However, Woods testified that, upon returning to the parking lot after delivering defendant to Quick in the station, he told Greg that he could either "go *** or hang out *** and wait for [defendant]." This choice of alternatives implied at least to Greg that he did not have the option of entering the building, much less sitting with defendant during the interview.  Moreover, and more significantly, prior to reading defendant the juvenile *Miranda* warnings, Quick stated to defendant, "We'll let you go back with your dad when we're done."  This very much implied to defendant that he could not have his father present for the interview such that the trial court's misapprehension, if any, was *de minimis*.

¶ 47    Second, the State contends that the trial court erred in stating that defendant was not informed that he was free to leave the interview room. The State notes that Quick told defendant directly that he had the right to stop the interview at any time and also that they would let him go back to his dad when they were done. Taken together, these remarks might have suggested to

defendant that he was free to terminate the interview and leave the station. However, as we shall explain, the court's error in this regard does not call into question its ultimate finding that defendant was in custody.

¶ 48    Turning to the *Braggs* two-step analysis for determining custody for *Miranda* purposes, we note that most of the relevant facts regarding the circumstances surrounding the interrogation were undisputed. Namely, after the noncustodial encounter with Woods at his home, which defendant and his family invited, defendant chose to go to the sheriff's office to make a voluntary statement. Greg drove him there. In the parking lot, Woods gave Greg the option of leaving the area and returning or staying there and waiting until the detectives were finished with defendant. Inside the building, defendant was not handcuffed or subject to a show of official force. While the preliminaries of the interview are ambiguous on the matter of custody, they are secondary to what occurred in the interview room immediately thereafter.

¶ 49    The sheriff's office building was not a friendly setting, of course, especially as it was locked. See *People v. Alfaro*, 386 Ill. App. 3d 271, 294 (2008) (sheriff's office is an "official setting that has been held to be inherently coercive"). Moreover, the interview room was windowless and sparsely furnished, and defendant was left alone there with the door closed for almost 10 minutes—factors tending to make the encounter seem coercive. The building was unfamiliar to defendant, increasing the coercive atmosphere. See *id.* (coerciveness of setting was greater because defendant was "dependent on the police to provide him with a way to leave the sheriff's office after the interview concluded"). Also, Greg was neither invited to join the interview nor present for any part of the interview.

¶ 50    The time was quite late, but defendant chose it. He had eaten dinner and was not hungry. There were only two detectives. They had their weapons but never touched them or referred to

them. The length of the interview, about 70 minutes including background information, was not unduly long. As to the mood and mode of the interview, we agree with the trial court (and both parties) that the detectives were not confrontational or abusive: they did their best to make defendant feel relatively at ease. However, just before reading the *Miranda* warnings, Quick told defendant that, because the facility was locked and he could not just "walk all the way out of here," somebody might consider him in custody. The statement was hedged, but its import was, at a minimum, that defendant *might* not be free to leave.

¶ 51   Turning to defendant's age, intelligence, and mental makeup, we note the following. Defendant was a few months over 18 and had had no previous encounters with the police. These factors favor finding that he would not have felt free to leave. Quick did tell defendant that he was free to end the interview whenever he wanted. However, aside from the possibility that being free to stop talking did not imply being free to leave the facility, the statement did not erase the potentially coercive effects of the setting, especially as applied to someone who had only recently been a juvenile in the eyes of the law and who was inexperienced with the criminal justice system.

¶ 52   In sum, the inherently coercive setting of defendant's interview was amplified by the austerity of the surroundings and the delay between defendant's arrival and the start of questioning. Quick's references to custody, however guarded, suggested the possibility defendant was not free to leave. Defendant was young and had had no experience with the criminal justice system. He was essentially told he could not see Greg until the questioning was over. All these observations, of course, must be considered in the context of defendant being acutely aware that he had already informed Woods of sexual misdeeds. Under these circumstances, a reasonable innocent person in defendant's position would have felt *not* at liberty to terminate the interview and leave. See *Braggs,* 209 Ill. 2d at 505-06. Accordingly, we uphold the trial court's finding that defendant was in

custody when he was questioned and turn to the State's argument that, even if defendant was in custody, defendant's waiver of his *Miranda* rights was valid.

¶ 53                                       B. Validity of *Miranda* Waiver

¶ 54    Waivers of constitutional rights must be voluntary, but they also must be "knowing and intelligent acts in the sense that they are done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* at 514-15. "A criminal suspect is not required to know and understand every possible consequence of a waiver of the Fifth Amendment privilege for it to be knowingly and intelligently made." *Id.* at 515. However, the suspect must at least understand basically what those rights encompass and minimally what their waiver will entail. *Id.* Whether a waiver is knowing and intelligent depends on the facts of the case, " 'including the background, experience, and conduct of the accused.' " *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

¶ 55    In granting defendant's motion to suppress, the trial court emphasized that the detectives did not ask defendant whether he understood his rights. However, in denying the State's motion to reconsider, the trial court acknowledged that this inquiry was not essential to a voluntary waiver. Nevertheless, the trial court reasoned that, having gone to the authorities at the urging of his pastor, defendant might well have envisioned the interview as a type of confession, so that his admissions would not be used against him in criminal prosecution.

¶ 56    The State argues that the trial court placed undue weight on both the absence of a direct inquiry into defendant's understanding of the warnings and the influence of defendant's religious beliefs on his decision to speak to the detectives. According to the State, defendant knowingly and voluntarily waived his rights and sufficiently understood the consequences. The State notes that (1) defendant was over 18, educated, and had an employment history; (2) he was able to

communicate clearly with the detectives; (3) the juvenile *Miranda* warning were easy to understand; and (4) the video shows defendant nodding his head as Quick reads him his rights.

¶ 57    Defendant responds that the record does not show whether he understood that he would expose himself to criminal liability by confessing or, as the trial court surmised, believed that the interview was tantamount to a religious confession and would therefore be confidential. He contends that his youth, limited socialization, and inexperience with law enforcement all supported the trial court's decision. Defendant emphasizes that Quick repeatedly tried to downplay the significance of both the *Miranda* warnings and the interview, dismissing the former as a "formality" and saying of the latter, "We just want to know what's going on with this whole thing *** where we're at, what kind of services we can offer people and things like that."

¶ 58    Initially, we note that a suspect need not be asked directly whether he or she understands *Miranda* rights and that an understanding waiver of those rights may be inferred from the totality of the circumstances. See *State v. Lather*, 2006 Ohio 4477, ¶ 5, 853 N.E.2d 279.  Indeed, we note that the statutory juvenile warnings do not provide for asking a minor in custody whether he understands the warnings. See 705 ILCS 405/5-401.5(a-5) (West 2018) (requiring certain warnings and setting forth a presumption of inadmissibility for the statement of a minor, "who at the time of the commission of the offense was under 18 years of age" in the absence of compliance with the juvenile *Miranda* warnings and procedure). To be sure, it "perhaps would be better practice for law enforcement officers to ask specifically whether a suspect understands his or her rights." *Lather*, 2006 Ohio 4477, ¶ 13. Requiring so, however, would be inconsistent with the totality-of-the-circumstances approach to deciding whether a waiver is knowing for purposes of *Miranda*. See *id.* Although the trial court here did not impose such a *per se* rule, it does appear that, at least

in its original explanation of its decision, the court placed undue emphasis on the lack of such inquiry.

¶ 59    We also note the speculative nature of the trial court's finding that defendant's religious beliefs or motivations meaningfully influenced his decision to waive his rights. While there was certainly testimony that the pastor had counseled the family about the allegations and recommended that defendant speak to the police about the allegations with a focus on counseling, there was no testimony from defendant, any family member or the pastor as to the details of these conversations. Thus, there was insufficient information upon which to conclude what impact these interactions had on defendant's decision to speak with the officers at the station. Crucially, there was also no evidence that the detectives exploited defendant's religious beliefs to coerce or manipulate him into confessing. Indeed, the subject of defendant's encounter with his pastor did not come up until late in the interview, after defendant had admitted to sexual crimes in more detail.

¶ 60    That having been said, given the entirety of the record, we uphold the trial court's conclusion that the State did not prove that defendant's waiver of his rights was knowing, *albeit* for different reasons than suggested by the trial court. See *People v. Ringland*, 2015 IL App (3d) 130523, ¶ 33 (reviewing court may affirm on any grounds in the record), *aff'd*, 2017 IL 119484. Specifically, although the detectives satisfied the formal requirement of *Miranda* warnings, the record demonstrates that they diluted the warnings by repeatedly minimizing the significance and probable consequences of the interview. In effect, the detectives warned but then "un-warned" defendant, ultimately rendering defendant's waiver unknowing.

¶ 61    Before and after reading the *Miranda* warnings, Quick's additional statements undermined both their import and their importance. Early on, Quick reassured defendant twice that all the

detectives did was "talk to people." Shortly before reading the warnings, Quick suggested to defendant that he only had to give the warnings because "technically somebody may consider [him] in custody." More importantly, Quick reassured defendant that he was "not in any trouble," which was not correct given that defendant had admitted sexual misconduct to Woods (and was later charged with a felony). Similarly, Quick stated that the detectives "just want[ed] to talk to [him]." These statements, made in quick succession, were collectively misleading, especially where, earlier that evening, defendant had recounted "the whole situation" to Woods. The natural import of Quick's statements was that the interview was nothing to worry about, so the warnings Quick next gave were unimportant.

¶ 62    Quick then read the warnings, which did admonish defendant that anything he said could be used against him in court. Although this did not explicitly refer to criminal prosecution, a person of defendant's intelligence and education would make that inference. Immediately afterward, however, Quick told defendant that the warnings were "just a formality," that defendant was not in trouble, and (yet again) that the detectives merely wanted to talk to him. Collectively, Quick's statements conveyed that, although defendant had just been warned, there was nothing about to happen that actually merited the warning.

¶ 63    Shortly after defendant edged toward incriminating himself by referring to "sexual stuff." Quick told him, soothingly, that the detectives "just want[ed] to know what [was] going on with this whole thing" and "what kind of services" they could offer him. Again, the implication, if subtle, was that self-incrimination would not have criminal ramifications, *i.e.*, that the interview was the start of a therapeutic process, not a prequel to criminal prosecution. Our review of the entire taped interview demonstrates that, throughout the questioning, especially when defendant

appeared to struggle to answer questions, Quick told him that they were "just talking" or "just \*\*\* chatting."

¶ 64    Given the above, we conclude that the State did not meet its burden to prove that defendant knew and understood the very serious act of waiving his right against self-incrimination. The interactions with defendant lulled a young and inexperienced suspect from understanding "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" (*Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Stated otherwise, the detectives' repeated assurances likely influenced defendant's decision to speak by deprecating the serious consequences of the interview, portraying it as merely a means to provide benevolent "services" to defendant. In addition, they minimized the *Miranda* warnings as a mere "formality" required only because their superiors were worried about technicalities. At some point, the pervasiveness of such comments diluted the *Miranda* warnings, essentially de-*Mirandizing* defendant. The trial court properly suppressed defendant's statements.

¶ 65                                    III. CONCLUSION

¶ 66    For the reasons stated, we affirm the order of the circuit court of McHenry County.

¶ 67    Affirmed.